FILED
ASHEVILLE, N.C.

JUL 16 2020    Hand-Delivered

U.S. DISTRICT COURT
W. DIST. OF N.C.

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

KATHERINE MONICA VICKERS, ESTATE OF )
KATHERINE MONICA VICKERS, and )
RUPA VICKERS RUSSE, INDIVIDUALLY AND )
AS EXECUTOR OF ESTATE OF KATHERINE )
MONICA VICKERS )
400 Stillhouse Branch, Rd. Marshall, NC 28753 )
)
           Plaintiffs, )
)
    v. )
)
UNITED STATES OF AMERICA, )
Office of Chief Counsel (02) )
251 North Main Street )
Winston-Salem, North Carolina 27155 )
)
           Defendant. )

1:20-cv-92

COMPLAINT

Rupa Vickers Russe, individually and as Executor of Katherine Monica Vickers', deceased, Estate file Plaintiff's Original Complaint against the United States of America, its officers, agents, employees, and representatives (Defendant) and would respectfully show the court the following:

## I.    PARTIES, JURISDICTION, SERVICE OF PROCESS, & VENUE

1. The claims asserted herein: medical malpractice, ordinary negligence, wrongful death and survival case, intentional and negligent infliction of emotional distress, breach of contract, gender discrimination. Plaintiffs assert res ipsa loquitur applies.

1

2. Plaintiff, Rupa Vickers Russe (hereinafter referred to as "Ms. Russe"), is the Executor of the Estate of Katherine Monica Vickers (hereinafter referred to as "Ms. Vickers"). Through probate in Madison County, N.C., Ms. Vickers' residence was established to be 400 Stillhouse Branch Rd., Marshall, NC 28753 at the time of her death. Ms. Russe resides at 400 Stillhouse Branch Rd., Marshall, NC 28753. The Plaintiff, Ms. Russe brings this action in her capacity as the Executor of the Estate of Katherine Monica Vickers, Madison County estate file no. 19 E 71.

3. Plaintiff, Ms.Russe, is the daughter and Healthcare Power of Attorney of Ms. Vickers, deceased, and brings her personal claims against Defendant on her own behalf.

4. The Defendant is the United States of America, its officers, agents, employees, and representatives.

5. This Federal District Court has jurisdiction of this cause because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671-80, commonly known as the Federal Tort Claims Act, which vests exclusive subject-matter jurisdiction of Federal Tort Claims in the Federal District Court.

6. The United States may be served with process in accordance with Rule 4(j) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on the United States Attorney Andrew Murray, United States Attorney for the Western District of North Carolina, by certified mail, return receipt requested at his office:

> United States Attorney,
> 227 West Trade St.
> Suite 1650
> Charlotte, NC 28202

7. And by serving a copy of the Summons and Complaint on William Barr, Attorney General of the United States, by certified mail, return requested, at the Attorney General's Office:

> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-000.

2

8. And by serving a copy of the Summons and Complaint on Dan Rattray, Chief Counsel, of the Veteran's Administration, by certified mail, return requested, at the Chief Counsel's Office:

> Office of Chief Counsel (02)
> 251 North Main Street
> Winston-Salem, North Carolina 27155

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e), as the United States is a Defendant and both Plaintiffs, Katherine Monica Vickers' Estate and Ms. Russe, reside in this district. Further, venue is proper in this district pursuant to 28 U.S.C. § 1391(e) as the United States is a Defendant and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## II. LIABILITY OF THE UNITED STATES OF AMERICA

10. This case is commenced and prosecuted against the United States of America pursuant to and in compliance with 28 U.S.C. §§ 2671-80, commonly referred to as the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. §§ 1346(b)(1) and 2674 because the personal injuries and resulting damages of which complaint is made, were proximately caused by the negligence, wrongful acts or omissions of employees of the United States of America at the Charles Georges VA Medical Center (hereinafter, "CGVAMC"), the Washington D.C. VA Medical Center (hereinafter, "WDCVAMC"), and the Durham VA Medical Center (hereinafter, "DVAMC"), while acting within the scope of their office or employment, under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

## III. JURISDICTIONAL PREREQUISITES

11. Pursuant to 28 U.S.C. §§ 2674 and 2675(a), Plaintiffs filed their claims with and presented administratively to the Defendant's agency the Department of Veterans Affairs

on approximately October 03, 2019. No response has been received from the Defendant. Six months has passed since the claim was presented administratively to the Defendant's agency. Accordingly, Plaintiffs have complied with all the jurisdictional prerequisites and conditions precedent to commencement and prosecution of this litigation.

12. Pursuant to D.C. Law § 16–2802, Defendant has been given notice 90 days prior to filing this complaint.

## IV. AGENCY, EMPLOYMENT & SCOPE

13. The Department of Veteran Affairs is an agency of the United States of America. The United States of America, (hereinafter, "Defendant"), through its agency, the Department of Veterans Affairs, at all times material, owned, operated and controlled the health care facilities, CGVAMC, WDCVAMC, and DVAMC, staffed said health care facilities with its officers, agents, servants or employees.

14. At all relevant times, all persons involved in the medical and health care services provided to Katherine Monica Vickers at the CGVAMC, the WDCVAMC, and the DVAMC were officers, agents, servants, or employees of the Department of Veterans Affairs, the United States of America, or some agency thereof, and were at all relevant times, acting within the course and scope of such employment.

## V. CHOICE OF LAW

15. Plaintiffs request that the laws governing the jurisdiction of Washington D.C. be applied in deciding the following claims:

    a. against the WDCVAMC, and

    b. in relation to all Plaintiff's medical negligence claims related to Ms. Vickers' brain tumor;

    c. Wrongful death;

    d. Breach of contract;

    e. Intentional Infliction of Emotional Distress

4

16. Plaintiffs request that all other claims be decided under the laws of the jurisdiction the court deems most appropriate.

## VI. OBJECTION TO N.C.G.S. § 90-21.19

17. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

18. Plaintiffs object to N.C.G.S § 90-21.19 ("the cap on noneconomic damages") as unconstitutional. The cap on noneconomic damages denies medical malpractice Plaintiffs, including Plaintiffs in this action, the right to a jury trial, due process of law, equal protection under the law, and the right to open courts, violates the separation of powers, and confers an exclusive emolument on health care providers in violation of the United States and North Carolina constitutions. The cap on noneconomic damages violates the Seventh and Fourteenth Amendments of the United States Constitution and Article I, sections 6.18. 25. And 32 and Article IV, sections 1 and 13 of the North Carolina Constitution.

## VII. STATUTE OF LIMITATIONS

19. Katherine Monica Vickers' had a very large disease of the brain, an oligliodendroma brain tumor, that at time of discovery in July 2017 occupied the entire left frontal lobe of her brain.

20. Ms. Vickers signed a Healthcare Power of Attorney on August 02, 2017, appointing her daughter, Ms. Russe, as her Power of Attorney and Healthcare Power of Attorney.

21. Ms. Vickers brain tumor made Ms. Vickers mentally incompetant.

22. A brain tumor is a disease as recognized in N.C.G.S. Chapter 35A § 35A-1101(7).

23. Pursuant to N.C.G.S. § 1-17, all Ms. Vickers legal claims tolled until the cause of action accrued, on the date of her death, October 16, 2018.

5

## VIII. FACTS

*Medical Treatment*

24. Ms. Vickers was a 100% service connected disabled veteran. Ms. Vickers was a veteran of the Navy and served during the Korean Conflict.

25. Ms. Vickers gained her 100% service-connected disability designation and award at some time prior to 1999.

26. At no time prior to July 2017 was Ms. Vickers encouraged or informed by any employee or agent of Defendant that she should seek medical care at a non-VA medical health center.

27. Ms. Vickers began receiving medical care under her designation at the WDCVAMC. She received her primary care, and speciality care at the WDCVAMC from approximately 1993 through 2007.

28. 100% service connected veterans are issued a primary care physician who oversees and directs all medical consultations and prescriptions for veterans. They act as a gatekeeper that exclusively decides if a specialty department is necessary for diagnosis or treatment of a symptom.

29. Ms. Vickers first received care at the CGVAMC in their emergency room due to a fall she suffered on January 11, 2005, while she was visiting her daughter, Ms. Russe, and two of her granddaughters who resided in Asheville, NC at the time.

30. Ms. Vickers moved to Asheville, NC, and received her primary care from the CGVAMC between December 13, 2006 until approximately November 2009.

31. Ms. Vickers moved to Hillsville, VA, and began receiving primary care at either/or all the Salem VA Medical Center, the Wytheville VA Medical Center, or the Hillsville VA Medical Center between November 25, 2009 until approximately May 2, 2012.

32. Ms. Vickers moved back to Asheville, NC, and began receiving primary care from the CGVAMC between approximately July 16, 2012 through 2018.

33. Following diagnosis of the brain mass in her head in July 2017, Ms. Vickers began receiving primary care from a coordinated effort between the CGVAMC and the

6

DVAMC between approximately July 25, 2017 and the date of her death October 16, 2018.

34. On July 21, 2017 Ms. Vickers was brought to the CGVAMC Emergency Room by Ms. Russe after Ms. Vickers had suffered a week of acute delirium, headache, vomiting, a seizure and attempts at drinking her own vomit.

35. Ms. Vickers was 82 when the CGVAMC provided emergency room care for Ms. Vickers on July 21, 2017.

36. During the week prior to July 21, 2017, because of witnessing Ms. Vickers' symptoms, Ms. Russe had contacted the CGVAMC Women's Health Center, where Ms. Vickers was assigned for her primary care. Ms. Russe was unable to reach Ms. Vickers' primary physician, Dr. Lara Hume. Ms. Russe spoke with a nurse and described the symptoms and was advised to call 911 if symptoms persisted. Ms. Russe called 911 on approximately July 19, 2017. The Ambulance technicians came to visit Ms. Vickers at her home and felt there were no grounds to bring Ms. Vickers to the hospital as they deemed her reactions to likely be blood sugar related. That evening after the Ambulance technicians left, Ms. Russe found Ms. Vickers delirious sitting on the edge of her bed vomiting multiple times and unable to understand simple commands.

37. The CT Scan taken at the CGVAMC ER on July 21, 2017, showed a "large heterogeneous mass effect with loss of anatomic gray matter-white matter differentiation which occupies most of the left frontal lobe, although with some extension posteriorly into the adjacent parietal and temporal lobes. There are multiple small patchy foci of high attenuation scattered throughout this abnormal area consistent with areas of acute/recent hemorrhage. There is effacement of the cortical sulcal pattern in this area. There is also effacement of the left lateral ventricle with some midline shift and subfalcine herniation". Ms. Vickers was diagnosed in the CGVAMHC ER with a large mass in her brain that occupied much of her brain.

38. On July 27, 2017, Ms. Vickers underwent a biopsy of her brain at the Mission Neurology Department. The biopsy was conducted by a Mission Neurosurgeon and initially assessed by Mission Neurooncologist, Dr. Praveen Vashist.

39. Ms. Vickers elected to have her neurooncology care provided by the Duke Robert Tisch Cancer Center, as Ms. Vickers was hopeful her case would be helpful to the research of brain tumors and she had lost faith in the medical care provided by the VA medical care system.

40. In approximately November 2017, the mass was confirmed, through biopsy, by the Duke Robert Tisch Cancer Center to be an oligodendroma brain tumor, that had, according to Dr. Dina Randazzo, Ms. Vickers' Neuro-Oncologist, likely been growing in Ms. Vickers' brain for over 5 years, possibly longer than a decade. Dr. Randazzo informed Ms. Vickers and Ms. Russe that had the tumor been diagnosed earlier, it could have been removed entirely and Ms. Vickers' life and mortality risk would not have been impacted by it.

41. Following a 1999 MRI, Ms. Vickers began being treated by Neurologist, Dr. Marshall Ballish in the WDCVAMC. He provided all her primary care from the time she was transferred to him in approximately 1999, until the time Ms. Vickers permanently moved to Asheville, NC in December 2006, and began receiving her primary care under Dr. Sarala Rajkumar.

42. Dr. Sarala Rajkumar was Ms. Vickers' primary care physician at the CGVAMC from December 13, 2006 until approximately February 02, 2008.

43. Dr. Sarala Rajkumar noted in Ms. Vickers' medical record that she reviewed the WDCVAMC medical record of Ms. Vickers via the Vista web, remote system on January 03, 2008.

44. Dr. Scott Wright was Ms. Vickers primary care physician at the Hillsville, VA Medical Center from November 2009 until May 2012.

45. Dr. Scott Wright noted in Ms. Vickers' medical record that on December 04, 2009, he had reviewed Ms. Vickers chart from a "remote site". After reviewing the record, he ceased prescribing a medication used in relation to stroke control, Coumadin for Ms. Vickers as he could not find any associated conditions in the record to indicate an ongoing need for anticoagulants, even though the medical record shows on April 24, 2009 that Dr.s Webster C. Bazemore and Marc Ryan of the CGVAMHC ER noted Ms. Vickers was prescribed Coumadin for a "known history" of DVT in January of 2009.

8

46. Dr. Lara Hume was Ms. Vickers' primary care physician at the CGVAMC from approximately 2012 until 2018.

47. Dr. Lara Hume of the CGVAMC never, in six (6) years of treating and being Ms. Vickers' exclusive primary care provider prior to her July 2017 ER visit, noted or acknowledged any details of Ms. Vickers' prior history of ischemic stroke, previous MRIs or the prior CT scan of her brain, all listed in her VA medical record; all of which showed issues in the brain.

48. From 2005 until 2018, 13 years of Ms. Vickers' treatment at CGVAMC, no healthcare provider, including Urologist Alan Freidman, Primary Care physician Dr. Lara Hume, Clinical Psychologists Lawrence Lardieri, Angela Steep, Elizabeth Latty, requested or ordered follow-up testing on Ms. Vickers' neurological function based on Ms. Vickers prior history of MRI's and 9 years of exclusive primary care provided by Neurologist, Dr. Ballish at the WDCVAMC.

49. At no time is there evidence any CGVAMC provider discussed with Ms. Vickers her history of an ischemic stroke, issues seen in her prior radiology scans; or disclosed to Ms. Vickers any reason why she should have concern about her brain beyond the psychiatric issues.

50. Ms. Vickers' medical record indicates she was prescribed at the WDCVAMC, from February 15, 2000 to February 16, 2001, Levodopa; May 19, 1999-May 19, 2000, Gabapentin; September 16, 1992 Nitroglycerin. All drugs used in the medical field to treat a stroke. Yet, neither Dr. Sarala Rajkumar nor Dr. Lara Hume ordered a neurology consult to follow up the significant stroke interventions noted in Ms. Vickers' WDCVAMC record, including but not limited to: Ms. Vickers prescription for coumadin by Dr. Marshall Ballish at the WDCVAMC, and the multiple MRI's and CT scan that indicated issues in her brain as early as approximately 1999.

51. Ms. Vickers called Dr. Lara Hume on April 2, 2015 and requested a neurology consult referral because "she is still having issues with walking and standing up straight." LPN Claudette Scales spoke with Ms. Vickers. Lara Hume did not call Ms. Vickers back, but instead sent the following message to Claudette Scales, LPN, as a response to Ms.

Vickers, "This was discussed during our phone call 3/24/15. Polyarthralgias are from osteoarthritis and are not likely due to mold exposure. Similarly, testing for nerve damage from mold is not indicated based on her complaints of pain. She has chronic pain & stiffness for which acetaminophen was advised although she is fearful of taking any due to what she's read about it. Please help identify any issues that we can help her with."

52. Ms. Russe attempted to notify the CGVAMC of Ms. Vickers changing behaviors on multiple occasions beginning in 2016. Ms. Russe did not receive a response from Dr. Lara Hume until 2018.

53. The exact date of when Ms. Vickers' tumor began growing is unsettled.

54. On January 28, 2002, a CT of Ms. Vickers' brain ordered by Dr. Marshall Balish, reported showing cortical atrophy.

55. On April 24, 2003, an MRI of Ms. Vickers' brain ordered by Dr. Marshall Balish at the WDCVAMC, showed an area of concern. The MRI was read by Radiologist, John M. Athas, and reported to be a "left inferior frontal periventricular white matter T2 hyperintensity, which is non specific but likely reflects a region of chronic ischemic or gliosis. The prior study [a reference to a 3/26/99 scan] shows similar region."

56. On October 22, 2003, of Ms. Vickers' brain an MRI ordered by Dr. Marshall Balish at the WDCVAMC, showed an area of concern. The MRI was read by Radiologist, Alexander S. Mark, to "demonstrate an area of abnormal signal intensity in the left inferior frontal white matter most likely representing post traumatic encephalomacia." Dr. Mark made no reference to the prior two studies in his findings noted in the medical record.

57. Dr. Lara Hume never ordered any image scan, MRI or CT Scan of Ms. Vickers brain, even though there was a medical record of issues in the front left of her brain organ from her treatment at the WDCVAMC. Additionally, the ailments that Ms. Vickers was burdened with, including but not limited to incontinence and compliance issues, were evidenced in the medical record prior to and throughout Dr. Lara Hume's treatment of Ms. Vickers as her primary care physician.

58. Ms. Vickers was informed by Dr. Dina Randazzo during Ms. Vickers treatment of her brain tumor at the Duke Robert Tisch Cancer center that her oligodendroma was inoperable due to its size.

59. Ms. Vickers was placed on Tramadol chemotherapy to attempt to reduce the tumor's size. On June 29, 2018, Ms. Vickers' MRI showed the tumor was responding to treatment and shrinking.

60. Ms. Vickers' health proceeded to decline rapidly after approximately 2010.

61. Ms. Vickers reported to Ms. Russe that she felt ridiculed by Dr. Lara Hume for her dress and her smell and it further alienated her trust in her medical care provider. Ms. Vickers' compulsive behaviors toward food, her alienation of affection towards her four children, and four grandchildren caused her to live for over a decade in constant emotional turmoil and loneliness and suffering feelings of disconnect to and abandonment by and from her family.

62. Ms. Vickers suffered immensely from untreatable incontinence for over two decades of her life. Her ongoing challenges with urinary incontinence left her struggling through her late 60's and all of her 70's with increasing depression and low self-esteem. It caused Ms. Vickers to suffer from embarrassment and severe self-esteem and acute depression.

63. Ms. Vickers was a poet and a writer. From Kindergarten through High School graduation she earned straight 'A's, save for one B. Her intelligence and knowledge proffered her to the most interesting positions during the United States' most turbulent times in our history. Among other accomplishments: Ms. Vickers was chosen as the last private secretary for inventor of the chain-reaction, Dr. Leo Szillard; the Executive Director of the United Nations' Women's Organization in Washington D.C. in the late 1960's; a staff organizer of the 1968 Poor People Campaign's Resurrection City in Washington D.C.; John Conyers first congressional staff member; served as the Asst. Press Secretary for Eugene McCarthy's Presidential campaign; and was a Historian for the Columbia University Civil Right's Documentation Project. Her participation in these activities were historically significant for the study of our democracy during the 1960s.

64. Ms. Vickers had spoken to her children including Ms. Russe about her desire to write her memoir. She never had the ability to accomplish that task because her ailments disturbed her focus and comfort.

65. Ms. Vickers suffered great physical pain and immobilization in the last decade of her life.

*Nursing Home Placement*

66. Ms. Vickers required extensive physical support. At different times from July 2017 through October 16 2018, Ms. Vickers resided with her daughter Ms. Russe, at the Rose Manor Facility in Durham, at the Madison Health and Rehab Center (herein after, "MMRC"), and at Pruitt Health in Raleigh, not including multiple hospitalizations due to issues aggravated by her diagnosis and medical ailments and/or treatments that were influenced or caused by Ms. Vickers' brain tumor, size and impact of the duration of its growth.

67. Medical Records show Ms. Vickers had a history of being a pleasant elder patient. Some medical records indicate a hostility and anger that could have been a result of her brain tumor's location in the left frontal cortex.

68. The CGVAMHC offers coverage for placement of 100% service connected Veterans in community nursing homes.

69. The CGVAMC has a long term care facility available for high risk patients who cannot be placed in the nursing home free market, for their own safety or for that of other patients.

70. The CGVAMHC relies on the Medicaid star-rated assessment of community nursing homes.

71. Ms. Vickers moved to MHRCC in an attempt to move closer to her beloved 52 acres home in Marshall, NC.

72. At all times Ms. Vickers was a resident of MHRCC, she was morbidly obese and had limited mobility, relying on a wheelchair and on rare occasions a quad-cane.

12

73. At no time Ms. Vickers was a resident of MHRCC was Ms. Vickers on the mood adjuster Depakote.

74. Ms. Vickers' mental behaviors became difficult for MHRCC to manage.

75. MHRCC delivered Ms. Vickers to the CGVAMC on grounds she required a psychological exam. While there, MHRCC called the CGVAMC to inform them they would not allow Ms. Vickers to return to the facility.

76. The CGVAMC placed Ms. Vickers in an in-house ward for short-term medical needs. Ms. Vickers was an inpatient in the CGVAMC ward for approximately one (1) month.

77. The CGVAMC Social Worker Anthony F. Smalls informed Ms. Russe that Ms. Vickers had been "blacklisted" as high-risk in the Nursing Home private market due to having been evicted by MHRCC.

78. Anthony F. Smalls informed Ms. Russe he was having a very hard time placing Ms. Vickers. When asked by Ms. Russe if the CGVAMC had any in house long term care options for 100% service connected disabled veterans, Anthony F. Smalls responded that they have a facility on the CGVAMC campus, but he discouraged Ms. Russe of allowing placement of Ms. Vickers in it solely because she was a woman. He stated Ms. Vickers' "safety" would be at risk.

79. CGVAMC specifically discouraged Ms. Russe from placing Ms. Vickers in the in-house facility expressly because she was a female.

80. Ms. Vickers was placed by Anthony F. Smalls in the Pruitt Health Raleigh facility, a 3 star (out of Medicaid's 5 star rating system) facility in Durham, NC on July 25, 2018.

81. On October 16, 2018, Ms. Vickers was discovered at 3:45 am covered in vomit and non-responsive, she died at 6:06 am on October 16, 2018. Less than three (3) hours after first being discovered by the three (3) star facility. Pruitt Health medical records from the days before and day of her death are incomplete.

82. The Duke Regional Raleigh Emergency room treating physician, Dr. John W. Raister wrote in Ms. Vickers' medical report that upon arrival to his care, she had feces that had been left on her long enough for it to have become "caked".

83. When Ms. Russe was allowed to go to Ms. Vickers' in the Duke Regional Raleigh Emergency Room, Ms. Vickers was intubated but stable. Ms. Russe lent down alongside Ms. Vickers cheek and gave it a kiss. Ms. Vickers was unresponsive, but single tear streamed down Ms. Vickers left cheek.

84. Ms. Vickers suffered extreme physical pain and emotional duress in the hours prior to her death.

*Durham VA Fall and ER*

85. At the time of Ms. Vickers arrival in Durham in 2017, she weighed 259 lbs.

86. Ms. Vickers CGVAMHC medical record indicates that at least on July 21, 2017 she was designated a high fall risk.

87. After being moved to Durham, NC to begin treatment with the Duke Robert Tisch Cancer Center, Ms. Vickers was told by CGVAMHC her primary care would be provided to her at the DVAMC.

88. DVAMC records indicate that on September 01, 2017 over three (3) hours was dedicated to Ms. Vickers' case working with the TVC for CGVAMHC, the Acting Chief of Pharmacy for DVAMC, and other DVAMC medical professionals. Yet that meeting resulted in Ms. Vickers' being listed as "Independent" and with no note made of her extensive CGVAMHC record of being a fall risk.

89. Ms. Vickers medical record indicated that she was on a blood thinner at the time of her first appointment at DVAMC.

90. DVAMC records indicate the clinic was aware of Ms. Vickers brain tumor and that Ms. Russe had the Heathcare Power of Attorney at the time of Ms. Vickers' appointment in the clinic.

91. On Ms. Vickers' first appointment on September 13, 2017, Ms. Vickers was pushed in to the clinic by Ms. Russe on a stroller. Ms. Vickers was then pushed to the door of the examination room by Ms. Russe, however the door was too narrow, and Ms. Vickers was asked by Resident, Megan Elizabeth Dupuis, if she could walk in to sit down. Ms. Vickers complied. During the exam Ms. Vickers complained of a tingling in her foot and

14

numbness. Yet, the examining Resident stated to Ms. Vickers, "Do you feel that you can walk?", Ms. Vickers responded, "I think I can", Ms. Vickers stood and attempted to take one step toward the door, and promptly her leg gave out on her and she fell to the ground.

92. Ms. Vickers would not have attempted to walk had she not been asked to by the Resident.

93. Ms. Russe who was present was unawares generally of medical diagnosis, symptoms or risks and was reliant upon the Dr. in the examining room to determine safe protocol.

94. Ms. Vickers was taken to the Durham VA ER, she was in the ER for over three (3) hours. Multiple tests were run.

95. At no time during Ms. Vickers stay in the DVAMC stay did any healthcare provider explain to her or Ms. Russe that she was at risk for a hematoma, or that a hematoma could result in excruciating pain that would require pain medication, or that pain could be prevented by preventatively using compression on the at risk area to prevent growth of the hematoma.

96. Ms. Vickers was released to Ms. Russe at approximately 6 p.m. Upon arriving home to Ms. Russe's apartment and undressing for the night, it was discovered that Ms. Vickers had a large hematoma on her left leg that was painful and engorged. Ms. Russe attempted to call the VA for guidance and was instructed by a nurse on a hotline number to bring Ms. Vickers back to the DVAMC ER so a pain prescription could be written. Ms. Russe was told the Durham VA does not have an ambulance, and so Ms. Russe dressed and loaded Ms. Vickers back into her wheelchair while Ms. Vickers was in extreme pain and returned her to the Durham VA where Ms. Vickers was finally informed about her hematoma, the level of risk and written a pain prescription. They departed at approximately 11 p.m.

97. Ms. Vickers suffered immense physical pain for the approximately 6 hours during which time she did not receive treatment or was given an educated option for pain medication for her undisclosed hematoma injury; and suffered multiple months more of pain, further limited mobility, negative impact on her health and increased need for caretaking due to the hematoma.

## IX. CAUSE OF ACTION AGAINST THE UNITED STATES OF AMERICA

*Charles George VA - Medical Negligence*

98. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

99. Defendant was negligent in one or more of the following ways:

   a. Defendant failed to timely and properly care for Ms. Vickers;

   b. Defendant failed to timely and properly evaluate Ms. Vickers;

   c. Defendant failed to timely and properly treat Ms. Vickers;

   d. Defendant failed to timely and properly monitor Ms. Vickers;

   e. Defendant failed to review Ms. Vickers complete medical record;

   f. Defendant failed to timely and properly provide follow-up neurology testing for Ms. Vickers;

   g. Defendant failed to timely and properly provide follow-up testing for Ms. Vickers;

100. At all times relevant to this lawsuit, the officers, employees, agents or representatives of the United States were negligent and causative of the injuries and damages sustained by the Plaintiffs.


*Washington D.C. VA - Medical Negligence*

101. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

102. Defendant was negligent in one or more of the following ways:

   a. Defendant failed to timely and properly care for Ms. Vickers;

   b. Defendant failed to timely and properly evaluate Ms. Vickers;

   c. Defendant failed to timely and properly treat Ms. Vickers;

   d. Defendant failed to timely and properly monitor Ms. Vickers;

   e. Defendant failed to properly note diagnosis and/or treatment in Ms. Vickers' medical record;

16

    f.  Defendant failed to timely and properly provide follow-up testing for Ms.
        Vickers;

103.    At all times relevant to this lawsuit, the officers, employees, agents or representatives of the United States were negligent and causative of the injuries and damages sustained by the Plaintiffs.

<em>Durham VA - Medical Negligence</em>

104.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

105.    Defendant was negligent in one or more of the following ways:

    a.  Defendant failed to timely and properly care for Ms. Vickers;

    b.  Defendant failed to timely and properly evaluate Ms. Vickers;

    c.  Defendant failed to timely and properly treat Ms. Vickers;

    d.  Defendant failed to timely and properly monitor Ms. Vickers;

    e.  Defendant failed to properly inform Ms. Vickers of her injury;

    f.  Defendant failed to properly inform Ms. Vickers' Healthcare Power of Attorney of her injury;

    g.  Defendant failed to timely and properly provide medication for Ms. Vickers' injury;

106.    At all times relevant to this lawsuit, the officers, employees, agents or representatives of the United States were negligent and causative of the injuries and damages sustained by the Plaintiffs.

<em>Durham VA - Ordinary Negligence</em>

107.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

108.    The Defendant owed a duty of reasonable care to Ms. Vickers. To the extent the breach of Defendant's duties as alleged in the foregoing claims for relief constitutes ordinary negligence rather than or in addition to medical malpractice and/or professional negligence and/or statutory rights violations this negligence is hereby pled.

17

109.    As a direct and proximate result of Defendant's ordinary negligence Ms. Vickers suffered injury as alleged herein.

110.    As a direct and proximate result of the negligence of the Defendant set forth herein Ms. Vickers fell in the examining room at the DVAMHC clinic and then was not notified of the hematoma injury or how to treat it by the DVAMC ER. Ms. Vickers suffered physical injuries that increased her medical caretaking needs, emotional distress, inconvenience and other damages in excess of ten thousand dollars ($10,000). Ms. Vickers' caretaker, Rupa Vickers Russe, suffered mental anguish, emotional distress, inconvenience, and other damages in excess of ten thousand dollars ($10,000).

111.    By reason of the foregoing, each of the Plaintiffs have been damaged and is entitled to recover for all damages incurred and to be incurred from the Defendants jointly and severally in an amount in excess of ten thousand dollars ($10,000) with interest from date this suit is instituted additionally pursuant to N.C.G.S. § 7A-243 each of the Plaintiffs suffered damages as set forth herein in an amount in excess of the new jurisdictional amount listed as the minimum for cases to be filed in superior Court including those filed after June 30, 2015.

*Wrongful Death and Survival Action*

112.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

113.    As a direct and proximate result of the negligence of the Defendant Ms. Vickers suffered harm which resulted in her death.

114.    As a result of the death of Ms. Vickers her children and granddaughters have been deprived of the services, care, assistance, society, companionship, guidance, kindly office and advice of Ms. Vickers.

115.    As a result of the negligent acts rendered to Ms. Vickers by the Defendant and ultimate death caused by the Defendant's negligence and gross negligence as set out herein, Ms. Vickers Estate incurred unnecessary expenses, out of pocket expenses, and funeral expenses.

116. Pursuant to the wrongful death law and D.C. Law § 16–2701 and other applicable laws of Washington D.C. in effect on the date of Ms. Vickers's death demand is made for damages caused by the unlawful and wrongful death of Ms. Vickers is heretofore alleged and is set forth in detail inside wrongful death statute to which reference is made and including the following:

   a. Hospital medical and ambulance expenses incident to the injury resulting in death;

   b. Compensation for pain and suffering of Ms. Vickers;

   c. Reasonable funeral expenses for Ms. Vickers;

   d. Services, protection, care, and assistance of Ms. Vickers whether voluntary or obligatory to the person is entitled to the damages recovered;

   e. Society, companionship, comfort, guidance, kindly officers and advice of the decedent to the persons entitled to the damages recovered.

117. On account of the wrongful death of Ms. Vickers proximately caused by the negligence, willful, wanton, reckless, and gross acts of negligence by the Defendant as herein alleged each of the Plaintiffs is entitled to recover all damages including punitive damages incurred and to be incurred from the Defendant in an amount in excess of ten thousand dollars ($10,000).

*Veteran's Affairs Administration - Breach of Contract*

118. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

119. At all times relevant hereto Ms. Vickers was a 100% service connected disabled veteran who entered into a contract for services to be performed by Defendant through their employees, agents, and servants which provided for services which were personal and related directly to matters of dignity and mental concern.

120. It was understood by and between the parties to the agreement that breach of the obligations under the contract could and would cause severe emotional distress and mental anguish.

121.    At all times relevant hereto Ms. Vickers fully performed contractual duties and obligations to Defendant.

122.    Defendant unjustifiably and without legal excuse failed to perform both expressed and implied promises which were required by the contracts, and violated or failed to fulfill the obligations agreements and/or duties imposed by the contracts.

123.    The defects or omission which constituted the Defendant's failure to perform essential and important acts, these defects or omissions impacted directly resident's fundamental dignity as a human being and her physical and mental well-being. In no way were such acts or omissions trivial or slight.

124.    The Defendant breached their contract with Ms. Vickers as set forth above as a direct and proximate result of the Defendants breach in each of the Plaintiffs suffered damages as set forth in excess of ten thousand dollars ($10,000).

*Intentional and/or Negligent Infliction of Emotional Distress*

125.    The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

126.    Defendant engaged in the conduct described above and willfully and intentionally, recklessly, and/or negligently caused Plaintiffs severe emotional distress. Defendant knew or should've known that Ms. Vickers' family, including but not limited to Rupa Vickers Russe and Ms. Vickers children and granddaughters, would reasonably rely on Defendant's conduct and obligation to provide the necessary medical review of Ms. Vickers' records and order tests to prevent the physical and emotional duress Ms. Vickers and her undiagnosed, untreated illness caused on her daily life and in relations with her family.

127.    Additionally the conduct of Defendant in the following ways rises to the level of intent to cause harm or gross negligence:

    a.  ignoring medical records;

    b.  ignoring Ms. Vickers requests for referral;

    c.  purposefully ignoring Ms. Vickers' medical complaints of ailments;

d. negligently, grossly negligently, and purposefully and willfully failing to follow required recordkeeping protocol by failing to note Ms. Vickers' medical record with all treatments and discovered ailments;

e. willfully and purposefully placing Ms. Vickers at risk as a high risk, high needs patient in the community nursing home free-market instead of an in-house nursing home facility, because of her sex.

f. willfully and purposefully disregarding Ms. Russe's concerned reports about Ms. Vickers' mental behaviors.

128. Defendant knew or should've known that their acts or failure to act were reasonably likely to result in severe emotional distress to Ms. Vickers and her family. The Defendant's actions and failures to act directly resulted in severe emotional distress to Ms. Vickers and caused severe emotional stress to her family and were extreme and outrageous prior to her death. Ms. Vickers suffered severe emotional distress each and every time she received substandard treatment and care. She spent years suffering because of Defendant, which Defendant knew or should have known would cause severe emotional distress.

129. Ms. Vickers' daughter, Rupa Vickers Russe, also suffered severe emotional distress including but not limited to severe depression and post-traumatic mental health issues as a result of the intentional and/or negligent conduct of the Defendant which caused Rupa Vickers Russe, Ms. Vickers' Healthcare Power of Attorney and daughter, to have a contentious relationship with Ms. Vickers for many years due to Ms. Vickers undiagnosed symptoms.

130. Defendants actions were intentional, willful, wanton, and/or reckless and entitles Plaintiffs to punitive damages.

131. As a direct and proximate result of the Defendant actions each of the Plaintiffs is entitled to recover damages in excess of ten thousand dollars ($10,000) for injuries sustained and the resulting medical expenses as applicable at all proximately resulting from and caused by Defendant's conduct. Additionally should the court apply North Carolina choice of law to this claim, pursuant to N.C.G.S. §7A-243 each of the Plaintiffs

suffered damages as set forth herein in an amount in excess of the new jurisdictional amount listed as the minimum for cases to be filed in superior Court including those filed after June 30, 2015.

### Charles George VA - Gender Discrimination

*132.* The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

*133.* The CGVAMHC intentionally, willfully and wantonly discriminated in the placement of Ms. Vickers in a long term nursing facility based on her sex. Their actions exposed Ms. Vickers to limited community nursing home options due to her high risk label as a high needs patient. This resulted in Ms. Vickers being placed in a facility whose sanitation standards and resources were less than what male veterans receive and have access to at the CGVAMHCC in-house nursing facility.

134. Ms. Vickers suffered extreme physical pain and emotional duress in the hours prior to her death and ultimately death at the non-CGVAMC in-house community nursing home facility and received a lower standard of care than was available to high risk male veterans at the CGVAMHC in-house facility, because of her sex.

135. As a direct and proximate result of Defendant's actions each of the Plaintiffs is entitled to recover damages in excess of ten thousand dollars ($10,000) for injuries sustained and the resulting medical expenses as applicable at all proximately resulting from and caused by Defendant's conduct. Additionally should the court apply North Carolina choice of law to this claim, pursuant to N.C.G.S. §7A-243 each of the Plaintiffs suffered damages as set forth herein in an amount in excess of the new jurisdictional amount listed as the minimum for cases to be filed in superior Court including those filed after June 30, 2015.

## X. DAMAGES

136. Because of Defendant's negligence, the Plaintiff's have suffered, and continue to suffer, severe injuries, including physical and mental pain and suffering; permanent

physical impairment; loss of enjoyment of life; loss of earnings and earning capacity; out of pocket expenses and pecuniary losses. Plaintiffs bring this suit to recover all damages cognizable under the applicable state and federal law resulting from the injuries to them.

137.    Because of the negligence of the United States employee healthcare providers, Ms. Vickers sustained damages and injuries including:

  a.   Pain, suffering and mental anguish;

  b.   Health and attendant care expenses

  c.   Physical disfigurement;

  d.   Loss of earning and earning capacity;

  e.   Loss of familial consortium with children and grandchildren;

  f.   Loss of enjoyment of life;

  g.   Mental impairment;

  h.   Physical impairment;

  i.   Out of pocket expenses; and

  j.   Other pecuniary damages

In addition, Ms. Vickers seeks recovery of all other damages to which she is entitled to pursuant to the applicable state and federal laws.

138.    As Healthcare Power of Attorney, daughter and caretaker of Ms. Vickers, Rupa Vickers Russe, individually incurred damages, including:

  a.   Mental anguish

  b.   Loss of parental consortium

  c.   Other pecuniary damages.

In addition, Ms. Russe seeks recovery of all other damages to which she is entitled pursuant to applicable state and federal laws.

139.    As the family of Ms. Vickers, individually have incurred damages, including:

  a.   Mental Anguish;

  b.   Loss of consortium with their Matriarch, Ms. Vickers; and

  c.   Other pecuniary damages.

In addition, the family of Ms. Vickers seeks recovery of all other damages to which they are entitled pursuant to the applicable state and federal laws.

## XI. PUNITIVE DAMAGES

140. The preceding numbered paragraphs are incorporated herein by reference as fully as if set forth word for word.

141. The above acts and failure to act of the employees of Defendant, by and through its employees and/or agents as thoroughly detailed in all the above paragraphs, were intentional and/or willful and wanton. They were performed in conscious disregard of and in indifference to the rights and safety of a:

    a. previously diagnosed stroke victim and 100% service connected disabled high risk elderly female veteran; and

    b. Defendant knew, or should have known, that the above facts or failure to act were reasonably likely to result in severe physical and/or mental suffering.

142. Defendants' conduct was therefore intentional and/or willful or wanton, giving rise to a claim for punitive damages in an amount to be determined by the jury.

143. In addition the actions listed in the above paragraphs, Defendant's conduct was willful and wanton as evidenced by:

    a. Pursuant to 38 United States Code (U.S.C.) 7304(a) and Chapter 5, §§ 5.03(5) and 5.04(a) and (e), the pattern and practice of failing to properly document medical issues in Ms. Vickers' record by the professional contributing to her patient record;

    b. ignoring Ms Vickers' complete medical record, including her prior Radiology records, prior to making diagnosis or treatment plans for Ms. Vickers.

    c. failing to order follow-up CT or MRI scans of Ms. Vickers' brain, an aging female veteran with 100% service-connected disability designation due to a disease of the brain, to assess brain organ health.

    d. Intentionally discouraging enrollment of Ms. Vickers, due to her sex, in the CGVAMHC high risk in-house care facility and placing her at the whim of the

free market's willingness to accept and properly care for a high-risk, high-needs elderly female patient, resulting in her placement in a Medicaid rated 3 star facility which had 19 deficiencies in the year prior to Ms. Vickers placement, according to the N.C. Department of Health Services Regulation; a facility providing below the level of care at the CGVAMHC, due to her sex.

144. Defendant was on notice their failures to act in a reasonable manner and according to federal, Washington D.C. and/or North Carolina law could result in Ms. Vickers' death.

145. Defendant knowingly ignored the laws and knowingly put Ms. Vickers in danger.

146. The actions of Defendant and the supervisors, administration, and employees of Defendant, as detailed herein were therefore willful or wanton giving rise to a claim for punitive damages in an amount determined by the jury.

## XII. RELIEF SOUGHT

147. Plaintiffs request that the Defendant be cited in terms of law to appear and answer herein: that upon final trial and hearing hereof, Plaintiffs have judgment against the Defendant, for the amount of actual damages; and for such other and different amounts as they shall show by proper amendment before trial; for post judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other and further relief, at law and in equity, both general and special, to which the Plaintiffs may show themselves entitled to and which the Court believes them deserving.

## XIII. RES IPSA LOQUITUR

148. Ms. Vickers was a 100% service connected female veteran who was encouraged to and provided with 100% of her medical care by the Veteran's Administration through its medical centers from approximately 1999 until 2018.

149. Ms. Vickers was diagnosed in 2017 with an oligliodendroma brain tumor that at time of diagnosis filled her entire frontal left cortex and was spreading into other areas of her brain.

25

150. Ms. Vickers received exclusive neurology primary care from 1999 until 2007 at the WDCVAMC.

151. Ms. Vickers received:
    a. a CT scan in 1999 that indicated an issue in Ms. Vickers brain;
    b. Two (2) MRI's in 2002 that indicated distinct issues in Ms. Vickers brain.

152. Ms. Vickers was told she had suffered a stroke prior to 2002.

153. Ms. Vickers received annual primary care checkups, and extensive consults to multiple clinics throughout the year each year, including urology, psychology, dermatology, diabetes.

154. No MRI's or CT scans were conducted after 2003 until 2017.

155. No inquiries were made regarding Ms. Vickers prior stroke after 2007.

156. Ms. Vickers was very ill because of the brain tumor and its size.

157. An oligodendroma brain tumor removed prior to becoming too large can allow a patient to survive with no residual issues.

158. Ms. Vickers' brain tumor was deemed too large to operate.

159. Ms. Vickers' health and emotional relationships suffered greatly due to the brain tumor and it not being diagnosed.

160. Ms. Vickers' life was shortened and she died in 2018, years before the ages both her parents lived to, Mother 92, father 87.

161. The duration of Ms. Vickers' treatment by Defendant and the size of the tumor diagnosed to be a very slow growing tumor, warrant an inference of Defendant's negligence.

162. The direct act or omission by Defendant that caused Ms. Vickers' injury may be indeterminable; Ms. Vickers' health care and management was in exclusive control of the Defendant for approximately 30 years; the size and type of tumor indicate the amount of time Defendant failed to act reasonably, and had the Defendant acted the tumor could have been removed, and Plaintiffs injuries would not have occurred.

*Charles George VA Medical Center*

26

163. The cause of Ms. Vickers death was due to Defendant not diagnosing a brain tumor for potentially over a decade, even though Ms. Vickers received extensive annual care through the Defendant starting approximately in or before 1999 as documented in her medical record prior to Ms. Vickers treatment at the CGVAMHC.

164. CGVAMHC failed to review the entirety of Ms. Vickers medical record; failed to issue consults to the neurology department for continued follow-up of the WDCVAMC radiology reports; and failed to order any brain scans for the entirety of her treatment at CGVAMHC even though Ms. Vickers' service-connected disability was a disease of the brain.

165. No expertise or medical training is needed to comprehend the risk of not reviewing prior medical records available in the database for eight (8) years while providing active, exclusive treatment. Plaintiff requests pursuant to N.C.G.S. Rule 9(j)(3), standing based on the common law doctrine of res ipsa loquitur.

166. No expertise or medical training is needed to comprehend the risk of not inquiring about the history of radiology studies of the body organ that is itself the source of the 100% service-connected designation and was actively being treated with medication at time of transfer from and by another VA Medical Center for a physical brain issue. Plaintiff requests pursuant to N.C.G.S. Rule 9(j)(3), standing based on the common law doctrine of res ipsa loquitur.

*Washington D.C. VA Medical Center*

167. Should the Court deem North Carolina the proper choice of law for the claims against the WDCVAMC, Plaintiffs argue:

   a. Defendant was aware Ms. Vickers had issues in her brain, and Defendant failed to identify the cause of the issues in her brain.

   b. No expertise or medical training is needed to comprehend the risk of not identifying the cause of a found problem discovered in a brain. Plaintiff requests pursuant to N.C.G.S. Rule 9(j)(3) standing based on the common law doctrine of res ipsa loquitur.

27

c. Defendant failed to record Ms. Vickers' radiologist findings properly in her medical record.

d. No expertise or medical training is needed to comprehend the risk of not recording a diagnosis clearly in a medical record. Plaintiff requests pursuant to N.C.G.S. Rule 9(j)(3) standing based on the common law doctrine of res ipsa loquitur.

## Durham VA Medical Center

168. Durham VA failed to provide proper support to a visibly morbidly obese, physically unstable woman, who reported numbness in her leg and disclosed brain disease in her appointment, to request her to walk unassisted resulting in her falling in a Durham VA Clinic.

169. Durham VA failed to disclose to Ms. Vickers or her Healthcare Power of Attorney, Ms. Russe, that she had an injury on her leg. Defendant discharged Ms. Vickers without informing her or Ms. Russe, about the injury to Ms. Vickers' leg, resulting in Ms. Vickers experiencing excruciating pain and discomfort until a second ER trip could be arranged five (5) hours later.

170. No expertise or medical training is needed to comprehend the risk of: not allowing a visibly unsteady person who just disclosed they had a tingling and numbness in their right foot to walk unescorted; and/or to not disclose to a patient a diagnosed injury. Plaintiff requests pursuant to N.C.G.S. Rule 9(j)(3) standing based on the common law doctrine of res ipsa loquitur.

## XIV N.C.G.S. Rule 9(J)

### Objection to N.C.G.S. Rule 9(J)(1) and (2)

171. The Plaintiffs object to the requirements of Rule 9(j) of the North Carolina Rules of Civil Procedure on the basis that this Rule seems to require Plaintiffs to prove their cases before factual discovery is even begun. This Rule denies medical malpractice Plaintiffs their rights of due process of law, or equal protection under the law, of the right to open

courts, and of the right to a jury trial (in violation of the United States and North Carolina Constitution) and further, that Rule 9(j) is an unconstitutional violation of the following: (A) Amendment VII and Amendment XIV of the United States Constitution; (B) Article I, Section 18, 19 and 35 of the North Carolina Constitution.

172.    Furthermore, Plaintiff's argue that by allowing the 9(j) rule to govern dispensation of justice in NC, it encourages a culture of silence amongst medical professionals which represses the industry from correcting bad practices or polices. Protected by Rule 9(j), there is no motivation for Medical practitioners to speak up to correct bad practices because it not only puts a target on their back in their profession, the silence is benfeicial to medical professionals. Silence, and not participating in legal actions, maintains the medical culture that preserves employment, and standard operating procedures that may benefit providers, but may not be in the best interests of patients. North Carolina's 9(j) rule results in burdening the potential victim in having to experience such an egregious case that no medical professional can turn away from it. Yet most egregious medical cases arise after years of low-level infractions that cause pain and suffering for prior victims, but are never addressed or corrected. Left to simmer, only to eventually result in obvious dereliction of practice standards. In this case alone, had Ms. Vickers' record been reviewed early enough by at least three Doctors at the CGVAMC, her slow growing brain tumor may have been surgically removed, and she able to live a better life and to an age similar to her parents. The bad practice of failing to review medical records caused immense injury to Ms. Vickers, her children and grandchildren.

*N.C.G.S. Rule 9(J)(1) and (2) Motion for Extension*

173.    Without waiving said objection, the Plaintiffs named above intend to commence a medical malpractice action against the prospective Defendants named above on a cause of action that arose in Buncombe County, and, based on the facts listed below, needs additional time to comply with Rule 9(j) of the North Carolina Rules of Civil Procedure. The applicable statute of limitations has not yet expired. The Plaintiffs move to extend the statute of limitations for a period not to exceed one hundred twenty (120) days.

WHEREFORE PLAINTIFF PRAYS THE COURT that each of the Plaintiffs seek recovery of the Defendant all damages actual, compensatory, and punitive incurred or to be incurred in excess of ten thousand dollars ($10,000) with interest from this date the suit was instituted. Additionally should the court apply North Carolina law to any or all claims herein asserted, pursuant to N.C.G.S. § 7A-243 each of the Plaintiffs suffered damages are set forth herein and amount in excess of the new jurisdictional amount listed as the minimum for cases to be filed in Superior Court including those filed after June 30, 2015 Plaintiffs further pray that the cost of this action be taxed against the Defendant and for any further relief as this court meeting just improper

PLAINTIFFS HEREBY MAKE DEMAND FOR TRIAL BY JURY.

This the 16th day of July, 2020

By: _____

Rupa Vickers Russe, J.D.
Pro Se and as Pro Se
Representative of the Estate of
Katherine Monica Vickers
400 Stillhouse Branch Rd.,
Marshall, NC 28753
Telephone: 828-380-9522