# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:20-cv-00092-MR-WCM

| | |
|---|---|
| RUPA RUSSE, et al., ) | |
| ) | |
| Plaintiffs, ) | <u>**MEMORANDUM OF**</u> |
| ) | <u>**DECISION AND ORDER**</u> |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment [Doc. 110].

## I.    PROCEDURAL BACKGROUND

On July 16, 2020, the Plaintiffs Rupa Vickers Russe ("Ms. Russe"), Katherine Monica Vickers, and the Estate of Katherine Monica Vickers ("the Estate") initiated this action against the United States pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346.[1]   [Doc. 1].   The Plaintiffs' Complaint asserted nine causes of action: medical negligence based on

---

[1] There are currently only two Plaintiffs left in this matter: (1) The Estate of Katherine Monica Vickers / Rupa Vickers Russe as the Executor of the Estate ("the Estate") and (2) Rupa Vickers Russe ("Ms. Russe").  The Estate is represented by Brooke Nichole Scott. [Doc. 65 at 1 n.1].  Rupa Vickers Russe is an attorney who is proceeding *pro se* with respect to her individual claims.  [Id.].

events at the Charles George VA Medical Center ("CGVAMC"), medical negligence based on events at the Washington D.C. VA Medical Center ("WDCVAMC"), medical and ordinary negligence based on events at the Durham VA Medical Center ("DVAMC"), wrongful death and survival, breach of contract, intentional and negligent infliction of emotional distress, and gender discrimination.  [Id. at ¶¶ 98-135].

On December 16, 2020, the Plaintiffs filed two motions: (1) a "Motion for Leave to File an Amended Complaint, Grant N.C.G.S. 9(j) Extension, and Accept 9(j) Certification Filing" ("Motion to Amend") [Doc. 17] and (2) a "Motion to Join Lara Hume, MD" as a Defendant to this Action ("Motion to Join") [Doc. 18].  Pursuant to 28 U.S.C. § 636(b) and the Standing Orders of Designation of this Court, the Honorable W. Carleton Metcalf, United States Magistrate Judge, was designated to consider the Plaintiffs' Motion to Amend and the Plaintiffs' Motion to Join.  On May 6, 2021, the Magistrate Judge issued an Order denying the Plaintiffs' Motion to Amend and the Plaintiffs' Motion to Join.  [Doc. 27].  The Plaintiffs objected to that Order, [Doc. 31], and this Court affirmed the Magistrate Judge's Order denying the Plaintiffs' Motion to Amend and the Plaintiffs' Motion to Join on December 6, 2021.  [Doc. 41].

On January 6, 2021, the Defendant moved to dismiss the Plaintiffs' Complaint under Rules 12(b)(1), (b)(3), (b)(5) and (b)(6) and Rule 4(m) of the Federal Rules of Civil Procedure. [Doc. 21]. The Magistrate Judge was also designated to consider the Defendant's Motion to Dismiss. On May 6, 2021, the Magistrate Judge issued a Memorandum and Recommendation recommending that the Defendant's Motion to Dismiss be granted and that the Plaintiffs' Complaint be dismissed without prejudice. [Doc. 28]. On December 6, 2021, this Court accepted in part and rejected in part the Magistrate Judge's Memorandum and Recommendation. [Doc. 42]. This Court, therefore, dismissed the following claims: any claims asserted by Katherine Monica Vickers, the Plaintiffs' contract claim, the Plaintiffs' gender discrimination claim, and the Plaintiffs' claims based upon events at the WDCVAMC and the DVAMC. [Id. at 36]. The following claims survived: the Plaintiffs' medical negligence claim based upon events at the CGVAMC, the Plaintiffs' wrongful death claim based upon events at the CGVAMC, the Plaintiffs' negligent infliction of emotional distress claim based upon events at the CGVAMC, and the Plaintiffs' intentional infliction of emotional distress claim based upon events at the CGVAMC. [Id. at 36-37].

On February 3, 2022, the Plaintiffs appealed this Court's December 6, 2021 Order dismissing the Plaintiffs' gender discrimination claim and the

Plaintiffs' claims based upon events at the WDCVAMC. [Doc. 53]. The Defendant moved to dismiss the Plaintiffs' appeal as interlocutory. [Doc. 76]. On June 23, 2022, the United States Court of Appeals for the Fourth Circuit dismissed the Plaintiffs' appeal. [Id.].

On October 12, 2022, the Plaintiffs filed a "Motion to Amend and Supplement their Complaint and Modify Scheduling Order Deadline" ("Second Motion to Amend"). [Doc. 108]. There, the Plaintiffs sought to amend their Complaint to include claims against the WDCVAMC and to supplement their Complaint to include specific allegations against the CGVAMC for violations of VA Directive 1143.2. [Id. at 2; Doc. 108-1 at 1].

On October 13, 2022, the Defendant filed the present Motion for Summary Judgment, arguing as the sole basis for relief that the Plaintiffs' claims are untimely under the FTCA. [Doc. 109]. On November 1, 2022, the Plaintiffs filed a "Motion for Leave to File Response to Defendant's Motion for Summary Judgment" ("Motion for Leave"). [Doc. 120]. Attached to their Motion for Leave, the Plaintiffs also filed a "Response to Defendant's Motion for Summary Judgment and Request of Plaintiffs to File Counter Motion for Summary Judgment," [Doc. 120-2], and a "Statement of Undisputed Material Facts in Support of Their Counter Motion for Summary Judgment," [Doc.

120-3].[2]  On November 1, 2022, this Court granted the Plaintiff's Motion for Leave. [Text Order Dated Nov. 1, 2022].  The Plaintiffs never filed a Motion for Summary Judgment.  On November 1, 2022, the Plaintiffs also filed a "Consent Motion to Allow Plaintiffs to File Attachments to Their Response to Defendant's Motion for Summary Judgment" ("Motion to File Attachments"). [Doc. 121].  On January 3, 2023, this Court granted the Plaintiffs' Motion to File Attachments.  [Doc. 153].  On November 7, 2022, the Plaintiffs filed a "Consent Motion to Allow Plaintiffs to File Missing Memorandum in Support of Their Response to Defendant's Motion for Summary Judgment" ("Motion to File Missing Memorandum").  [Doc. 123].  The Court denied the Plaintiffs' Motion to File Missing Memorandum.  [Doc. 153].

On December 5, 2022, the Magistrate Judge issued an Order denying the Plaintiffs' Second Motion to Amend.  [Doc. 141].  The Plaintiffs objected to that Order, [Doc. 144], and this Court affirmed the Magistrate Judge's Order denying the Plaintiffs' Second Motion to Amend on January 3, 2023. [Doc. 152].

The Plaintiffs have also filed an "Amended Statement of Undisputed Material Facts in Support of their Response to Defendant's Motion for

---

[2] This Court's local rules provide that "[m]otions shall not be included in responsive briefs. Each motion must be set forth as a separately filed pleading."  LCvR 7.1(c)(2).

Summary Judgment" [Doc. 129], a "Notice of Supplement of Amended Statement of Undisputed Facts" [Doc. 137], numerous additional exhibits [Docs. 130, 131, 132, 154], and three notices of supplemental authority, [Docs. 138, 143, 147].

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id., 106 S. Ct. at 2510.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3, 106 S. Ct. at 2552 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" on the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." Eastern Shore Mkt. Inc. v. J.D. Assoc.'s, LLP, 213 F.3d 175, 180 (4th Cir. 2000). The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995). When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255.

## III.    FACTUAL BACKGROUND

The Defendant's Motion for Summary Judgment argues only that the Plaintiffs' remaining claims for medical negligence, wrongful death, negligent infliction of emotional distress, and intentional infliction of emotional distress based upon events at the CGVAMC are untimely under the FTCA. [See Docs. 110, 111]. Accordingly, the following recitation of facts includes only those facts which are pertinent to the issue of whether the Plaintiffs' claims were timely presented under the FTCA.

Ms. Katherine M. Vickers ("Ms. Vickers") served in the Korean Conflict and, thereafter, was designated as having 100 percent service-connected disabilities by the Department of Veterans Affairs (the "VA"). [Doc. 132-1 at 17]. Ms. Rupa Vickers Russe is Ms. Vickers' daughter. [Doc. 132-2 at 103]. In 2017, Ms. Vickers executed a Health Care Power of Attorney designating Ms. Russe as her agent for the purposes of making medical decisions for Ms. Vickers. [Id. at 103-09].

Ms. Vickers was treated at various VA medical centers, including the CGVAMC in Asheville, North Carolina. [See Doc. 1 at ¶¶ 27-33; see also Doc. 137-3; Doc. 137-7 at 1, 3-4, 12]. During her treatment at the CGVAMC, Ms. Vickers suffered from a lengthy list of medical issues, including obesity, breast cancer, joint pain, urinary incontinence, chronic pain, and diabetes,

among others. [Doc. 132-4 at 14-22]. Since, at least, 2012 or 2013, Ms. Vickers' primary care physician at the CGVAMC was Dr. Lara Hume. [Doc. 132-1 at 18-20; see also Doc. 132-2 at 50-51; Doc. 132-5 at 21-24; Russe Dep., Doc. 111-1 at 202-204].

On July 27, 2017, Ms. Vickers underwent a brain biopsy at Mission Hospital. [Doc. 137-9 at 8-9]. There, pathologists concluded that Ms. Vickers had a "left frontal brain tumor," and she was originally diagnosed with a "[l]ow grade glioma." [Id. at 8]. On August 1, 2017, Mission Hospital faxed a "Neurosurg Progress Note" to an employee at the CGVAMC. [Doc. 137-2]. That progress note stated that the pathology report was "consistent with either low grade glioma [or] gliomatosis cerebri" and recommended referral to the Duke Neuro-Oncology Clinic in Durham, North Carolina for further treatment. [Id. at 5].

While initiating Ms. Vickers' treatment at the Duke Neuro-Oncology Clinic, the CGVAMC was also referring Ms. Vickers to care at the DVAMC. [See Doc. 137-12 at 2]. On August 3, 2017, a social worker at the CGVAMC entered the following note in Ms. Vickers' medical record:

> The request is being made that once the Veteran is screened and approved for the CGVAMC CNH [("Community Nursing Home")] Program, please contact Jennifer Harris so she knows to proceed with the referral to the CNH in Durham. The Durham VAMC has already agreed to do the oversight visits

9

> for this veteran if she is placed in their catchment area. Since this is a within-VISN placement, the Asheville VAMC would remain payer-source and case manager indefinitely.

[Id.].

On August 14, 2017, Dr. Hume placed an order for "non VA care oncology" and noted that "oncologist Dr. Vashist 7/30/17 recommended daughter and vet pursue referral to Duke neuro oncology clinic for this relatively rare case." [Doc. 137-6 at 2-3]. On August 23, 2017, Ms. Vickers had her first appointment at the Duke Neuro-Oncology Clinic. [Doc. 154-1]. During Ms. Vickers' first appointment, Ms. Vickers and providers at Duke discussed the following regarding the role of providers at Duke and providers within the VA: "[the Duke Neuro-Oncology Clinic] will serve as a consulting service in care and will work collaboratively with local physicians. All chemotherapy will be managed by the local team. They are in agreement with this arrangement and verbalized understanding." [Id.].

While undergoing treatment at the Duke Neuro-Oncology Clinic, Ms. Vickers was followed by Dr. Randazzo. [Id.]. Ms. Vickers was ultimately diagnosed with an oligodendroglioma, stage two, and providers at the Duke Neuro-Oncology Clinic estimated that the tumor had been developing for five to ten years prior to diagnosis. [Russe Dep., Doc. 111-1 at 236-239]. Providers at the Duke Neuro-Oncology Clinic further estimated that Ms.

Vickers could live an additional five years if the tumor responded to chemotherapy. [Id. at 237].

On August 28, 2017, Ms. Russe sent Dr. Hume the following message through Ms. Vickers' online patient account with the VA:

> Dr. Hume,
>
> Per our conversation in which you requested specific dates for my calls requesting assistance regarding my mom's changing mental health. I'm attaching screenshots of the records.
>
> I called the VA 3x (the record shows) to complain about my mom's mental deterioration, plus in person conversations with: the Insulin clinic Dr., the nutritionist and the nurse in Women's health over the last year. Each time I was given the impression the correct person was forwarding my calls:
>
> VA records indicate beginning in 10/14/16 I called and followed up on November 29, 2016, and then again on May 17, 2017.
>
> I also brought it up in person during her nutrition appt. (who tried to reach you by phone during the appt.) and in person with the insulin clinic doctor during one of my mom's followups that I specifically accompanied her to because I was concerned no one was dealing with her diminishing mental state since beginning the insulin. I also pushed my mom in to the Women's Health Clinic in the fall of 16 or Spring of 17 after an Insulin clinic visit to personally request you contact me. I spoke to a nurse who said she would have you call me.
>
> Apparently my calls and in person requests were routed to every possible department but no further

investigation was initiated, just a non-compliant patient.

9/07/16 – Kukla entered 'Vet appears to have some mental health issues affecting her non-compliance with blood glucose levels'.
10/14/16 – 'Daughter of Vickers called, possible mental change.'  Killian states she called the listed numbers . . . I never received a message from Killian.
11/29/16 – 'veteran's daughter' (me) called in to request information regarding CLC.  I called to say I don't think my mom can handle living independently anymore due to her deteriorating mental and physical state, and this is the note they entered.  Ridiculous.
5/17/17 – Jancy Killian '[daughter] concerned about mental health.'

Even though consistently the conversation was about her mental health function, the fact that LCSW did not think cognitive function was impaired was apparently why no one thought to check her for a brain problem.  However, cognitive function HAD to have been diminishing as evidenced by her urine-soaked lifestyle.  The Duke neuro-oncologist thinks this likely is a very slow growing tumor, 5-10 yrs worth that is now huge and spreading from one side to the other side of her frontal lobe.  This tumor could explain her noncompliance issues, bedwetting/lifestyle issues.  Odd that no medical professional considered this as a possibility.

The fact that a non-VA/non POA person calls in to such a massive entity as the VA to give a warning about / or ask for care for a family member (with coverage level like my mom) and that information is not routed to the correct caregiver is mind-boggling.  At no time was I ever told, 'you need to speak with Dr. Hume', to the contrary, I was told throughout, "I will let your mom's Dr. know' (nutritionist, prosthetics) or 'that is a decision your mom's Dr. needs to make,

12

I will send a note to her" (by the insulin pharmacist, not Killian but a student pharmacist).

The VA has failed. This situation is not supposed to happen.

The aforementioned records are from a VA medical records request I submitted this month, they are all in the system.

In light of all of this, my mom respects and cares for you. She is grateful for your prompt assistance to help get her where she best will be cared for in her present circumstances.

Regards,
Rupa Russe

[Doc. 111-2 at 11-13] (uncorrected).

On August 28, 2017, Dr. Hume entered the following comment in Ms. Vickers' medical record regarding treatment for Ms. Vickers' brain tumor: "Alerted on note that . . . Duke needed authorization. Faxed both oncology auth and radiation oncology auths . . . Thank you for letting me know you don't think she'll need radiation, but I don't plan to discontinue the authorization in case something changes." [Id. at 3]. On August 29, 2017, an additional MRI conducted at Duke showed "stable disease compared to 7/27/17 with no new enhancement." [Doc. 154-1]. On the same date, a nurse practitioner at the Duke Neuro-Oncology Clinic entered notes in Ms. Vickers' medical record stating that "[g]iven stable disease and pathology

returning as oligodendroglioma . . . we recommend daily temodar," a chemotherapy drug. [Id.].

On August 30, 2017, Ms. Russe sent another message to Dr. Hume, stating, in part:

> FYI: 1. Duke will have her on multiple rounds of 28 day long chemo (temodar) with zofran for a few days to get started. 2. Her final diagnosis is an Oligodendroglioma, stage 2 (due to the size) which is the entire frontal right lobe and spreading to the center and left frontal lobe. Duke believes it has been developing for 5-10 yrs. The growth rate is (luckily very) slow. It would be operable with good results if it wasn't so large.
>
> She has the good gene markers for chemo. They do not believe it is the kind that at this time warrants radiation (thank you for taking the extra step of ordering it at my request even tho' now it is on hold because of good diagnosis). They say she could live 5 yrs if it responds to chemo.

[Doc. 111-2 at 14] (uncorrected). Ms. Russe testified that she "was very angry at Dr. Hume and had a very bad opinion of her from the date that [Ms. Vickers and Ms. Russe] found the mass until [Dr. Hume] and [Ms. Russe] had communications" and that Ms. Russe's "approach was to make sure [her] mom had the correct and best care to make her life as easy as possible." [Russe Dep., Doc 111-1 at 237].

While Ms. Vickers was treated at the Duke Neuro-Oncology Clinic, she was also dually enrolled in treatment at the DVAMC and the CGVAMC to

14

obtain the chemotherapy medication prescribed by Dr. Randazzo. [See Doc. 137-3; Doc. 137-7 at 1, 3-4, 8, 12]. In September and October of 2017, the VA planned to keep Dr. Hume as Ms. Vickers' primary care physician at the CGVAMC and to assign Ms. Vickers a second primary care physician at the DVAMC. [Doc. 137-7 at 3, 12]. Ms. Russe testified that, in September of 2017, she exchanged messages with Dr. Hume and Debra Blayclock, an employee at the CGVAMC, to "figure out the administrative pathway . . . of how to get the prescription for chemotherapy that Duke issues approved by Lara Hume and then issued in a timely manner." [Russe Dep., Doc. 111-1 at 227]. Ms. Russe further testified that:

> [F]or some reason [the chemotherapy medication] could not be mailed from Charles George and they wanted it to be dispensed by Durham VA. But Durham VA refused to dispense a prescription not issued by one of their own primary care providers, and so they insisted that they have an in-house oncologist approve, on top of Dr. Hume's approval, the Duke chemotherapy.

[Id. at 227-228].

Although the DVAMC initially insisted that Ms. Vickers obtain an in-house physician to approve the chemotherapy prescription, that requirement was eventually dropped. [See id. at 227-232]. Instead, Ms. Russe testified that Debra Blayclock at the CGVAMC helped her resolve the issue of

obtaining Ms. Vickers' chemotherapy medication such that Ms. Vickers and Ms. Russe "[no] longer had to rely on [the] Durham VA." [See id. at 231].

Dr. Hume remained Ms. Vickers' primary care physician until Ms. Vickers' death. [See id. at 202-204]. On January 24, 2018, Ms. Russe sent an email to Debra Blaylock stating that Ms. Vickers and Ms. Russe had "not been sent mom's chemo pills" and that they currently did "not have any." [Id. at 213; Doc. 132-2 at 75]. Later that day, Debra Blaylock entered a note in Ms. Vickers' medical record that the CGVAMC "[r]eceived scripts today from Duke and [the chemotherapy pills] will be mailed out today with delivery on Monday." [Doc. 132-2 at 75]. On January 25, 2018, Ms. Russe also sent a message to Dr. Hume stating that Ms. Vickers had run out of the chemotherapy medication prescribed to treat the oligodendroglioma. [Id. at 74]. Ann Paynter, a nurse working with Dr. Hume, responded that the medication had "not been sent because we haven't received [the] order from Dr. Randazzo." [Id. at 75].

On February 7, 2018, Dr. Hume ordered another outpatient oncology consultation for evaluation and treatment of Ms. Vickers' brain tumor. [Doc. 137-8 at 3]. On February 14, 2018, Dr. Hume entered the following note in Ms. Vickers' medical record:

In order to prevent chemotherapy treatment interruption (Temodar), please help arrange for pt to have[:]

1) appointment to see me to confirm clinical stability, preferably tomorrow, to allow communication / faxing / and overnight express mailing of prescription by Dina M. Randazzo, DO . . . .

2) transportation to appointment to see me, preferably tomorrow

3) CBC & CMP drawn prior to appointment w/ me

Dr. Randazzo has kindly agreed to prescribe this for patient x1 if above can be accomplished. It is my understanding that patient's last dose will be taken on 2/17/18 or 2/18/18 since she arrived at Madison Health & Rehab w/ only a 14 day supply.

Thank you for assistance w/ coordination of care.

[Doc. 132-2 at 80-81]. Dr. Hume also entered the following additional note:

Alternatively, I can try to communicate w/ Dr. Randazzo while pt is here in case she is able to fax the Temodar prescription right away to allow pharmacy to fill it & have it be sent back to Madison H & R w/ pt. She requires lab results & confirmation that pt is clinically stable before she'll fill it.

[Id. at 81].

Ms. Vickers died at Duke Regional Hospital on October 16, 2018. [Doc. 111-2 at 1]. On October 8, 2019, the VA received an unexecuted SF-95 from Ms. Russe stating an administrative claim arising from events at the CGVAMC. [Doc. 21-1]. On December 12, 2019, the VA received an

17

executed SF-95 from Ms. Russe stating the same facts as the unexecuted October 8, 2019 form.  [Id.].

## IV.  DISCUSSION

Under the FTCA, the United States has waived sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."  28 U.S.C. § 1346(b)(1).  The FTCA further provides that:

> A tort claim against the United States shall be forever barred *unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues* or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

Id. § 2401(b) (emphasis added).

In order to determine when the Plaintiffs' claims "accrued," the Court must first ascertain whether such claims sound in medical malpractice. Because the acts and omissions giving rise to the Plaintiffs' remaining claims occurred in North Carolina, the Court will apply North Carolina law to make this determination. See Eades v. United States, 168 F.3d 481, 1999 WL 25549, at *2 (4th Cir. 1999) (unpubl.) ("The Supreme Court has interpreted 'law of the place' to mean 'whole law of the State where the act or omission

occurred' – that is, not just its 'internal' substantive law but also its choice of law rules."); see also Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 853-54 (1988) (applying rule of *lex loci* to tort claims); Giblin v. Nat'l Multiple Sclerosis Soc., Inc., Case No. 3:07-CV-431-DCK, 2008 WL 4372787, at *4 (W.D.N.C. Sept. 23, 2008) ("North Carolina state cases, as well as federal decisions interpreting those precedents and forecasting what policy the courts would likely follow, have consistently relied on *lex loci* to determine the choice of law in tort cases, particularly those cases involving personal injury or wrongful death.").

Under North Carolina law, a medical malpractice action is defined, in part, as "[a] civil action for damages or personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." N.C. Gen. Stat. § 90-21.11(2)(a). Under that definition, the Plaintiffs' claims for medical negligence and wrongful death are clearly "medical malpractice" claims.

As for the Plaintiffs' emotional distress claims, emotional distress related to the provision of medical care constitutes a personal injury under § 90-21.11(2)(a). See Nichols v. United States, Case No. 5:09-CV-196-BO, 2010 WL 11622662, at *4 (E.D.N.C. Mar. 12, 2010) (analyzing plaintiffs' negligent infliction of emotional distress claim, brought under the FTCA, and

holding that "[e]motional distress is a personal injury and thus requires compliance with [the pre-filing certification requirement of North Carolina Rule of Civil Procedure] 9(j) where medical malpractice is the alleged cause of the injury"); <u>Norton v. Scotland Mem'l Hosp., Inc.</u>, 250 N.C. App. 392, 398-99, 793 S.E.2d 703, 708-09 (2016) (holding that, because intentional infliction of emotional distress claim was based on hospital's refusal to allow patient's wife and children to see him rather than on the medical care rendered, emotional distress claim was not a medical malpractice action and did not require a Rule 9(j) certification); <u>Bennett v. Hospice & Palliative Care Ctr. of Alamance Caswell</u>, 246 N.C. App. 191, 194-95, 783 S.E.2d 260, 263 (2016) (affirming dismissal of plaintiff's emotional distress claim for failure to comply with Rule 9(j) because it arose "from actions leading up to the death of her mother [and] concern[s] the provision (or lack thereof) of health care to [p]laintiff's mother").[3]   Here, the Plaintiffs' intentional and negligent infliction of emotional distress claims are clearly related to the medical care

---

[3] In this Court's December 6, 2021 Order accepting in part and rejecting in part the Magistrate Judge's Memorandum and Recommendation, this Court explained that, following <u>Pledger v. Lynch</u>, 5 F.4th 511, 523-24 (4th Cir. 2021), the pre-filing certification requirement for medical malpractice actions under Rule 9(j) of the North Carolina Rules of Civil Procedure does not apply in federal court.  [Doc. 42 at 27].  However, the Court's prior analysis regarding the inapplicability of N.C. Rule 9(j)'s certification requirement to this action does not affect the Court's current analysis regarding which of the Plaintiffs' claims fall within the definition of a medical malpractice action under N.C. Gen. Stat. § 90-21.11(2)(a).

or lack of medical care Ms. Vickers received at the CGVAMC.  [See Doc. 1 at ¶¶ 126-29].  Accordingly, the Plaintiffs' emotional distress claims are also "medical malpractice" claims within the meaning of the FTCA.

The Supreme Court has instructed that "[a] medical malpractice claim under the FTCA accrues when the claimant first knows of the existence of an injury and its cause."  Miller v. United States, 932 F.2d 301, 303 (4th Cir. 1991) (citing United States v. Kubrick, 444 U.S. 111, 100 S. Ct. 352, 62 L.Ed.2d 259 (1979)).  A plaintiff need not have actual knowledge of negligent treatment or be informed of the specific cause of injury to trigger the running of the limitations period.  Clutter-Johnson v. United States, 714 F. App'x 205, 206-07 (4th Cir. 2017) (citing Kubrick, 444 U.S. at 122, 100 S. Ct. 352; Gould v. U.S. Dept. of Health & Human Servs., 905 F.2d 738, 742 (4th Cir. 1990)).  Rather, the relevant inquiry is "whether [a plaintiff] knows or, in the exercise of due diligence, should have known . . . the cause of [the plaintiff's] injury." Id. (quoting Gould, 905 F.2d at 742) (internal quotation marks omitted).

However, "the statute of limitations does not begin to run on a medical malpractice claim upon a claimant's initial discovery of an injury and its cause so long as the claimant remains under the 'continuous treatment' of a physician whose negligence is alleged to have caused the injury; in such circumstances, the claim only accrues when the 'continuous treatment'

ceases." <u>Miller</u>, 932 F.2d at 304. Thus, the continuous treatment doctrine "effectively trumps a rigid application of <u>Kubrick's</u> first discovery rule," <u>id.</u>, and it allows a plaintiff to refrain from "challenging the quality of care being rendered until the confidential relationship [between a plaintiff and her doctor] terminates," <u>Otto v. Nat'l Instit. of Health</u>, 815 F.2d 985, 988 (4th Cir. 1987). The continuous treatment doctrine applies only where "the treatment at issue is for the same problem and by the same doctor, or that doctor's associates or other doctors operating under his direction." <u>Miller</u>, 932 F.2d at 305; <u>see also Otto</u>, 815 F.2d at 988-89 (holding that the continuous treatment doctrine applied where the plaintiff's "care at [the National Institute of Health ("NIH")] was supplemented with the follow-up treatment of local private physicians [and] that additional treatment was rendered at the advice and under the direction of the NIH physicians . . .").

Here, the undisputed forecast of evidence demonstrates that Ms. Vickers and Ms. Russe were aware of the nature of Ms. Vickers' injury by, at least, August 30, 2017. By that date, Dr. Randazzo had diagnosed Ms. Vickers with a stage two oligodendroglioma, estimated that the tumor had been growing for five to ten years prior to diagnosis, and estimated that Ms. Vickers could live an additional five years if the tumor responded to chemotherapy. [Russe Dep., Doc. 111-1 at 236-239; <u>see also</u> Doc. 111-2 at

14].  Ms. Russe further stated on August 30, 2017 that she understood the tumor would have been "operable with good results" if it had not been "so large" when diagnosed.  [Doc. 111-2 at 14].

Further, the undisputed forecast of evidence also demonstrates that Ms. Vickers and Ms. Russe either knew or should have known the alleged cause of Ms. Vickers' injury by, at least, August 28, 2017.  The Plaintiffs argue that, in August of 2017, Ms. Vickers and Ms. Russe did not know which specific doctors failed to diagnose Ms. Vickers' brain tumor because the Defendant refused to provide Ms. Russe with access to Ms. Vickers' medical records until 2019 and failed to disclose additional portions of Ms. Vickers' medical records until 2020 and 2022.  [Doc. 120-2 at 2-3].  However, Ms. Russe wrote to Dr. Hume on August 28, 2017 regarding the care that Ms. Vickers received at the CGVAMC prior to Ms. Vickers' diagnosis.  [Doc. 111-2 at 11-13].  In that message, Ms. Russe stated, in part, that:

> Even though consistently the conversation was about her mental health function, the fact that LCSW did not think cognitive function was impaired was apparently why *no one thought to check her for a brain problem.  However, cognitive function HAD to have been diminishing as evidenced by her urine-soaked lifestyle . . . This tumor could explain her noncompliance issues, bedwetting/lifestyle issues. Odd that no medical professional considered this as a possibility.*

[Id.] (emphasis added). Ms. Russe further wrote that she called the VA multiple times to express concerns about Ms. Vickers' mental state, that the VA did not route those concerns to the correct medical provider, and that "[t]he *VA has failed*. This situation is not supposed to happen." [Id.] (emphasis added). Ms. Russe also testified that, at this time, she "was very angry at Dr. Hume and had a very bad opinion of her from the date that [Ms. Vickers and Ms. Russe] found the mass until [Dr. Hume] and [Ms. Russe] had communications" following Ms. Vickers' diagnosis. [Russe Dep. Doc. 111-1 at 237]. Actual knowledge of negligent treatment or of the specific cause of injury is not necessary to trigger the running of the limitations period under the FTCA. Clutter-Johnson, 714 F. App'x at 206-07. Ms. Russe's message to Dr. Hume on August 28, 2017 indicates that, at that time, Ms. Russe believed that Dr. Hume and the providers at the CGVAMC had failed to connect Ms. Vickers' various symptoms to the brain tumor and, in doing so, had ultimately failed to diagnose the brain tumor at an earlier date.

Therefore, by August 30, 2017, Ms. Vickers and Ms. Russe were aware of the nature of Ms. Vickers' injury and either knew or should have known the alleged cause of that injury. The Plaintiffs, however, did not present an administrative claim until the end of 2019, more than two years

later.[4]  [Doc. 21-1].  Thus, all of the Plaintiffs' claims are time-barred unless the continuous treatment doctrine applies.

Even though the record indicates that Ms. Vickers and Ms. Russe knew about Ms. Vickers' injury and either knew or should have known the alleged cause of that injury as early as August 30, 2017, the Plaintiffs have presented evidence from which a reasonable factfinder could conclude that Dr. Hume continued to be involved in the treatment of Ms. Vickers' brain tumor until February of 2018.  For example, Ms. Russe testified that even as Ms. Vickers' chemotherapy medication was prescribed by Dr. Randazzo and Ms. Vickers was dually enrolled in care at the CGVAMC and the DVAMC, Dr. Hume continued to authorize or approve the chemotherapy medication in the VA system.  [See Russe Dep., Doc. 111-1 at 227-231].  On August 28, 2017, Dr. Hume sent oncology and radiology authorizations.  [Doc. 111-2 at 3]. Further, in January of 2018, Ms. Russe told both Dr. Hume and Debra Blayclock at the CGVAMC that Ms. Vickers had run out of chemotherapy pills, and the CGVAMC mailed the medication after receiving the prescription from the Duke Neuro-Oncology Clinic.  [Russe Dep., Doc. 111-1 at 213; Doc.

---

[4] The VA received both an unexecuted SF-95 from Ms. Russe on October 8, 2019 and an executed SF-95 from Ms. Russe on December 12, 2019.  [Doc. 21-1].  At this time, the Court need not decide whether an unexecuted SF-95 properly presents an administrative claim under the FTCA.

132-2 at 74-75]. Later, in February of 2018, Dr. Hume ordered an outpatient oncology consultation for further evaluation and treatment of Ms. Vickers' brain tumor, [Doc. 137-8 at 3], and she entered notes into Ms. Vickers' medical record stating that Ms. Vickers should schedule an appointment with Dr. Hume "to confirm clinical stability" and "prevent chemotherapy treatment interruption," [Doc. 132-2 at 80-81]. Ms. Russe testified that Dr. Hume remained Ms. Vickers' primary care physician until Ms. Vickers' death. [Russe Dep., Doc. 111-1 at 202-204].

Although it appears from this record that Dr. Randazzo was the physician prescribing the chemotherapy medication and was, perhaps, the primary physician treating Ms. Vickers' brain tumor, the record also shows that Dr. Hume continued to play at least some role in approving and dispensing the chemotherapy medication. Viewing the evidence in the light most favorable to the Plaintiffs as the nonmoving party, there is evidence presented from which a reasonable factfinder could conclude that the continuous treatment doctrine applies, thus starting the two-year statute of limitations in February of 2018, less than two years prior to Ms. Russe's submission of both the unexecuted SF-95 in October of 2019 and the executed SF-95 in December of 2019. [See Doc. 21-1]. Accordingly, the Court cannot conclude that the Plaintiffs' claims are untimely as a matter of

law, and the Defendant's Motion for Summary Judgment is, therefore, denied.[5]

**ORDER**

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 110] is **DENIED.**

**IT IS SO ORDERED.**

Signed: February 27, 2023

Martin Reidinger
Chief United States District Judge

---

[5] Because the Plaintiffs have raised a genuine issue of material fact as to whether the continuous treatment doctrine applies to the facts of this case, the Court need not reach the Plaintiffs' additional argument that equitable tolling should apply in this matter because (1) Ms. Vickers "was legally mentally disabled and incompetent" under N.C. Gen. Stat. §§ 1-17 and 35A-1101(7), (2) the Defendant failed to disclose Ms. Vickers' "complete or relevant medical records to her during her life or treatment at Duke," and (3) the Defendant's employees "intentionally refused to grant Plaintiff Russe access to the medical records until October 2019 . . . ." [Doc. 120-2 at 2-3].