# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:20-cv-00092-MR-WCM

| | | |
|---|---|---|
| **RUPA RUSSE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF** |
| | ) | **DECISION AND ORDER** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court following a bench trial on the
Plaintiffs' claims pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C.
§ 1346. Upon consideration of the testimony and evidence presented by the
parties, the Court hereby enters the following Findings of Fact and
Conclusions of Law.

## BACKGROUND

The Plaintiff Rupa Russe ("Ms. Russe") brings this action against the
United States under the FTCA as executor of the Estate of Katherine Monica
Vickers ("Ms. Vickers" or "the Decedent"), asserting claims of medical
malpractice, wrongful death, and claims of intentional and/or negligent

infliction of emotional distress on behalf of the Decedent.[1]  Ms. Russe also asserts claims of intentional and/or negligent infliction of emotional distress on her own behalf as the Decedent's daughter.  The Plaintiffs' claims arise out of the alleged failure of medical personnel at the Charles George Veterans Affairs Medical Center in Asheville, North Carolina ("Charles George VAMC") to diagnose the Decedent's brain tumor in a timely manner, resulting in the tumor being inoperable by the time of discovery, and ultimately resulting in the Decedent's death in October 2018.[2]

Although the claims asserted in this action are relatively straightforward, the litigation of this action has been anything but.  This case has been presented in an extremely haphazard and disorganized manner, resulting in over 200 filings to date.  This haphazardness and disorganization only intensified when this case proceeded to a bench trial.  There was a great

---

[1] The Plaintiffs' Complaint also asserted causes of action for medical negligence against the United States Department of Veterans Affairs ("VA") medical facilities in Washington, D.C. and Durham, North Carolina, as well as claims for breach of contract and gender discrimination.  Those claims were dismissed prior to trial.  [Doc. 42].

[2] In their Complaint, the Plaintiffs specifically allege that VA personnel were negligent in failing to timely and properly care for, evaluate, treat, monitor, provide follow-up testing for, and review the complete medical records of Ms. Vickers.  [Doc. 1: Complaint at ¶ 99].

deal of confusion regarding the order and numbering of exhibits.[3]  The Plaintiffs[4] repeatedly failed to comply with the instructions set forth in the Pretrial Order and Case Management Plan regarding the presentation of evidence.  In some instances, the Plaintiffs presented testimony that did not advance any particular issue.  In another instance, the Plaintiffs sought to submit an affidavit of a witness who had already testified—thereby attempting to supplement trial testimony without allowing the Defendant cross-examination on this new evidence.  Despite these difficulties, the Court nevertheless now seeks to put the pieces together in order to find the facts that are supported by the evidence and to adjudicate the Plaintiffs' claims.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    *Statute of Limitations*

A threshold question in this case is whether the Plaintiffs' claims are barred by the statute of limitations.  The FTCA provides that "[a] tort claim

---

[3] The parties identified more than 500 exhibits, consisting of thousands of pages, most of which were medical records.  Rather than presenting a chronological joint appendix of these records, the parties presented their own sets thereof, in no particular order that the Court can discern.  More frustrating, however, was the situation where some record was identified on both the Plaintiffs' and the Defendant's exhibit lists, implying that they were the same document, only to learn mid-trial (for instance) that the Plaintiffs' version consisted of seven pages while the Defendant's version consisted of four.

[4] The Estate is represented by attorney Brooke Nichole Scott.  The Plaintiff Rupa Vickers Russe is also an attorney who is proceeding pro se with respect to her individual claims.

against the United States shall be forever barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues . . . ." 28 U.S.C. § 2401(b). In order to "present" a claim to a federal agency, a claimant must submit a claim in writing by means of a "Standard Form 95" ("SF 95") or some equivalent thereof. See Ahmed v. United States, 30 F.3d 514, 517 (4th Cir. 1994). The SF 95 must provide notice that "(1) is sufficient to enable the agency to investigate and (2) places a 'sum certain' value on her claim." Id. (quoting Adkins v. United States, 896 F.2d 1324, 1326 (11th Cir. 1990).

Here, Ms. Russe submitted an unsigned SF 95 on October 8, 2019, and an identical, but signed, SF 95 on December 12, 2019. Both SF 95s asserts claims for "[m]ental and physical suffering of deceased, Katherine Vickers; loss of earning capacity due to decreased life span; physical pain and suffering, emotional suffering by deceased due to diagnosis, loss of familial relationships; Present cash value of deceased and loss of consortium, tangible and intangible, suffered by deceased's three surviving children, and three surviving grandchildren." [Pl. Ex. 303 at 4, 8] (errors uncorrected). Therefore, the only claims upon which the Plaintiffs can

proceed in this Court are those claims which accrued within two years of the filing of the SF 95s.[5]

As to the medical malpractice claims asserted by the Plaintiff on behalf of the Estate, the continuous treatment doctrine reaches back to include negligent actions during a period of continuous treatment which extends into that two-year period. Therefore, the Court will first examine the extent to which the continuous treatment doctrine applies to this case.[6]

Generally, a tort claim accrues at the time of injury. 28 C.F.R. § 801.2(d); see also United States v. Kubrick, 444 U.S. 111, 120 (1979). However, the Fourth Circuit has instructed that "[a] medical malpractice claim under the FTCA accrues when the claimant first knows of the existence of an injury and its cause." Miller v. United States, 932 F.2d 301, 303 (4th Cir.

---

[5] Because the Court determines that both SF 95 forms were received more than two years after the medical malpractice and wrongful death claims accrued, the Court need not decide whether an unexecuted SF 95 properly presents an administrative claim under the FTCA.

[6] The Plaintiffs previously have contended that this Court already determined that the "Plaintiffs' claims against the [Charles George VAMC] were timely presented before the FTCA statute of limitations ran" in denying in part the Government's motion to dismiss. [Doc. 120-2: Pltf. Response to MSJ at 1]. The Court's Order denying the motion to dismiss, however, is clear: the Court determined that the Plaintiffs had adequately *alleged* that their claims were timely filed, thereby preserving this issue for trial. [See Doc. 42 at 30]. The burden remained with the Plaintiffs to present sufficient evidence at trial to show that their claims were timely filed and, if necessary, the application of the continuous treatment doctrine. The Plaintiffs' apparent assertion that the Court's prior Order constituted some sort of partial judgment on the issue is entirely misplaced.

5

1991) (citing Kubrick, 444 U.S. at 119-24). A plaintiff need not have actual knowledge of negligent treatment or be informed of the specific cause of injury to trigger the running of the limitations period. Clutter-Johnson v. United States, 714 F. App'x 205, 206-07 (4th Cir. 2017) (citing Kubrick, 444 U.S. at 122; Gould v. U.S. Dep't of Health and Human Servs., 905 F.2d 738, 742 (4th Cir 1990) (en banc)). Rather, the relevant inquiry is "whether [a plaintiff] knows or, in the exercise of due diligence, should have known . . . the cause of [the plaintiff's] injury." Clutter-Johnson, 714 F. App'x at 206-07 (quoting Gould, 905 F.2d at 742) (internal quotation marks omitted).

The statute of limitations for a medical malpractice claim, however, may be tolled by the continuous treatment doctrine. Miller, 932 F.2d at 304. Under this doctrine, "the statute of limitations does not begin to run on a medical malpractice claim upon a claimant's initial discovery of an injury and its cause so long as the claimant remains under the 'continuous treatment' of a physician whose negligence is alleged to have caused the injury; in such circumstances, the claim only accrues when the 'continuous treatment' ceases." Id. Thus, the continuous treatment doctrine "effectively trumps a rigid application of Kubrick's first discovery rule," id., and it allows a plaintiff to refrain from "challenging the quality of care being rendered until the confidential relationship [between a plaintiff and her doctor] terminates," Otto

6

v. Nat'l Instit. of Health, 815 F.2d 985, 988 (4th Cir. 1987). The continuous treatment doctrine applies only where "the treatment at issue is for the same problem and by the same doctor, or that doctor's associates or other doctors operating under his direction." Miller, 932 F.2d at 305; see also Otto, 815 F.2d at 988-89 (holding that the continuous treatment doctrine applied where the plaintiff's "care at [the National Institute of Health ("NIH")] was supplemented with the follow-up treatment of local private physicians[, and] that additional treatment was rendered at the advice and under the direction of the NIH physicians").

Here, the Plaintiffs assert that Dr. Lara Hume, as Ms. Vickers's primary care physician and director of her care dating back to 2012, failed to diagnose Ms. Vickers's brain tumor when it was still treatable.[7] The Plaintiffs further claim that Dr. Hume continuously treated Ms. Vickers until at least February 2018, and thus the statute of limitations does not bar their medical malpractice claim. In order for the continuous treatment doctrine to allow the Plaintiffs to proceed on this theory, it was the Plaintiffs' burden to prove that Dr. Hume's treatment of Ms. Vickers (or treatment by Dr. Hume's

---

[7] As is discussed more fully *infra*, the Plaintiffs offered no competent evidence at trial to show when the brain tumor could have been diagnosed or treated any earlier than 2017.

"associates," at her direction) extended into the two-year period immediately preceding the filing of a proper SF 95.[8]

As explained more fully in the detailed findings regarding Ms. Vickers's medical treatment, *infra*, the Plaintiffs' medical malpractice claims accrued[9] on August 30, 2017, when both Ms. Russe and Ms. Vickers became aware that the Decedent had a brain tumor and that it had been present during the prior five to ten years, during some portion of which period the Plaintiffs claim that the tumor was operable. This date is more than two years before the

---

[8] The Plaintiffs appear to argue that the continuous treatment doctrine applies to *all* treatment provided by the VA to Ms. Vickers—going all the way back to the late 1980's. The Plaintiffs' position is apparently based on the idea that all healthcare providers employed by the VA are "associates" of each other and working at each other's direction. This argument, however, would lead to the conclusion that there is essentially no statute of limitations for FTCA claims against the VA so long as the veteran is receiving care at some VA facility somewhere in the country. The Plaintiffs have provided no authority for such a bold proposition. The Plaintiffs do not even explain how doctors at two different VA medical centers in different states, who have no communication with one another, are being "directed" by each other.

[9] The Plaintiffs do not claim that the accrual of the Estate's wrongful death claim accrued on a date different from the accrual of the medical malpractice claim. North Carolina law would appear to indicate that it does—accruing on the date of death. N.C. Gen. Stat. § 1-53(4); Udzinski v. Lovin, 159 N.C.App. 272, 278, 583 S.E.2d 648, 652 (2003). When a claim pursuant to the FTCA accrues, however, is a question of federal law. Gould, 905 F.2d at 742. As noted *supra*, a medical malpractice claim under the FTCA that resulted in death accrues when the plaintiff first knows of both an injury and its cause, even if the decedent later dies as a result. See Miller, 932 F.2d at 303 (holding that wrongful death was time-barred when two-year statute of limitations had already run on underlying medical malpractice claim). Thus, while it would appear that the Plaintiffs' wrongful death claim *might* have survived if it could have been brought under North Carolina law, it is nevertheless time-barred under the FTCA.

earlier of the Plaintiffs' attempted SF 95 filing. While the Plaintiffs argue that Dr. Hume's treatment and direction of treatment extended past that date, the evidence at trial showed, and the Court so finds, that the treatment of Ms. Vickers from August 30, 2017 forward was directed by Dr. Dina Randazzo at Duke University Medical Center ("Duke"). While Dr. Hume signed authorizations after that date for chemotherapy and radiology, those treatments were prescribed and directed by Dr. Randazzo. Dr. Hume's role was merely administrative, so as to allow for an outside provider to be paid for by the VA system.[10] The continuous treatment doctrine only allows a plaintiff to refrain from "challenging the quality of care being rendered until the confidential relationship [between the doctor and patient] terminates." Otto v. Nat'l Inst. of Health, 815 F.2d 985, 988 (4th Cir. 1987). Here, that relationship between Dr. Hume and Ms. Vickers ended when Dr. Randazzo took control of Ms. Vickers' treatment.

In their "rebuttal" post-trial brief, the Plaintiffs assert that the statute of limitations was tolled for the period after August 30, 2017 because Ms. Vickers "was legally mentally disabled and incompetent," citing N.C. Gen.

---

[10] Indeed, Dr. Henry S. Friedman—one of the Plaintiffs' own witnesses—who is a doctor at Duke where Ms. Vickers was treated for the tumor, specifically testified that Dr. Hume's direction of Ms. Vickers's treatment ceased once Ms. Vickers was admitted at Duke.

9

Stat. § 35A-1101(7).  [Doc. 204 at 3 n.3].  The Court finds that the Plaintiffs have failed to prove any disability or incompetence on the part of the Decedent.  The Plaintiffs have presented no evidence of an adjudication of incompetence, nor did the Plaintiffs present any expert testimony on this point.  The medical evidence certainly does not show any such disability or incompetence such that the statute of limitations would be tolled.  For these reasons, the Court finds and concludes that the Plaintiffs' medical malpractice claims and wrongful death claims stemming for such alleged medical malpractice are barred by the statute of limitations.

While the Court has concluded that these claims are time-barred, in light of the sheer volume of the record and its maddening disorganization, the Court will nonetheless proceed to address the merits of the Plaintiffs' claims in the interest of assisting those who may hereafter need to review this record.  The medical evidence and the proof regarding the interactions between the Decedent and the VA are largely undisputed.  This evidence, however, was presented at trial in an exasperatingly jumbled manner.  Particularly, there was no attempt to give a chronological account of this history.  The Court, therefore, endeavors to find the following facts, recounting them chronologically.

## B. Vickers's Medical History

Ms. Vickers served in the United States Navy from 1952 to 1953. [Pl. Ex. 5 at 1]. While serving in the Navy as an 18-year-old, she was sexually assaulted by two female officers, including her commanding officer. This so traumatized her as to affect her for the rest of her life. [Day 1 Tr., Doc. 196 at 62]. Ms. Vickers was ultimately diagnosed with posttraumatic stress disorder ("PTSD"). In 1995, because of the service-related nature of her trauma, she was awarded 100% service-related disability compensation by the VA. [Def. Ex. 97 at 2; Day 1 Tr., Doc. 196 at 61-62].

After living a somewhat bohemian lifestyle and bearing four children (including the Plaintiff Rupa V. Russe), Ms. Vickers began experiencing a serious decline in her health in her mid-50's. In addition to PTSD, she suffered from numerous medical ailments, including fibromyalgia, diabetes, and urinary incontinence. [See Pl. Ex. 3B (Decedent's "problem list" at Charles George VAMC)]. As a result, until her death in 2018 she frequently sought medical care at various VA medical centers, including facilities in Baltimore, Maryland ("Maryland VAMC"); Washington, D.C. ("WDC VAMC"); Martinsburg, West Virginia ("WVA VAMC"); Salem, Virginia ("Salem VAMC"); Asheville, North Carolina ("Charles George VAMC"); and Durham, North

11

Carolina ("Durham VAMC).[11]  [Id. at 137; Def. Exs. 95-97].  The following is a summary of the medical treatment she received at these VA facilities.

In 1997, Ms. Vickers reported to a doctor at the WVA VAMC that she had "pain all over," including "pain in the occipital area of her skull for 45 years."  [Def. Ex. 95 at 1].  She reported to that doctor that her pain caused difficulty walking.  [Id.].  During that appointment she also reported insomnia and fatigue.  [Id.].  In 1999, in an appointment with a provider at the Maryland VA, Ms. Vickers reported experiencing debilitating anxiety, including plucking out her eyebrows, and suffering from flashbacks and hallucinations related to her PTSD.  [Def. Ex. 100 at 1-2].

In May of 2001, Ms. Vickers underwent a neuropsychological evaluation at the Maryland VAMC after she reported concerns of declining memory and a family history of Alzheimer's disease.  [Def. 97 at 1].  However, that evaluation revealed that her cognitive function was normal and not consistent with Alzheimer's disease.  [Id. at 5].  The Maryland

---

[11] Thousands of pages of Ms. Vickers's medical records were admitted into evidence in this case. However, there are some entries in the records about which no testimony was solicited. For example, the evidence in this case includes reports of a vascular consult for problems Ms. Vickers had with her feet in 2007, [Pl. Ex. 103 at 1]; reports of a sore Ms. Vickers had on her leg in 2007, [Pl. Ex. 95 at 5]; and the fact that Ms. Vickers canceled a dermatology appointment in 2001, [Pl. Ex. 100 at 4]. Even for those records about which a witness testified, the relevance of many records is often unclear. Nevertheless, the Court will make findings of fact related to Ms. Vickers's various interactions with the VA system that the Plaintiffs highlighted during the course of this trial.

provider concluded that "[i]t is likely that Ms. Vickers' psychiatric problems (e.g. somatic complaints, mild depression, and PTSD) are contributing to her perceived cognitive problems." [Id.].  At that same appointment, she reported that she had been experiencing urinary and fecal incontinence for "several months," and the provider recommended a urodynamic study; however, Ms. Vickers "refuse[d] to schedule the test."  [Id. at 1].

In November 2001, in an appointment with a provider at the WDC VAMC, Ms. Vickers complained that she had experienced urinary incontinence for approximately two years. [Def. Ex. 65 at 1]. That provider opined that Ms. Vickers was dealing with stress incontinence.[12]  [Id.].  In January 2002, Ms. Vickers presented to the WDC VAMC complaining of a "new predominant right sided headache."  [Day 1 Tr., Doc. 196 at 64; Pl. Ex. 11 at 25-26].  A subsequent CT exam revealed "[m]inimal cortical atrophy" and was "otherwise normal."  [Pl. Ex. 11 at 25-26].

Significant to the Plaintiffs' claims is an MRI of Ms. Vickers's brain performed at the WDC VAMC in April 2003 after she complained of "worsening cognition."  [Pl. Ex. 11 at 17].  The results of that study indicated

---

[12] "Stress urinary incontinence is the sudden, involuntary loss of urine secondary to increased intraabdominal pressure that is affecting the patient's quality of life." https://www.ncbi.nlm.nih.gov/books/NBK539769/ (last accessed June 3, 2024).

"left inferior frontal periventricular white matter T2 hyperintensity, which is non-specific but likely reflects a region of chronic ischemia or gliosis. . . . *There is no evidence of an intracranial mass*, hemorrhage or acute infarction. No hydrocephalus is present." [Id. at 18] (emphasis added).

In October 2003, a follow-up MRI was performed after Ms. Vickers experienced an episode of left facial numbness and pain. [Id. at 14]. That study indicated normal results with the exception of "an area of abnormal signal intensity in the left inferior frontal white matter most likely representing post traumatic encephalomalacia."[13] [Id. at 15]. No further scans were ordered of Ms. Vickers's brain while she was under the care of the WDC VAMC. [Friedman De Bene Tr. at 53; Def. Ex. 98 at 1].

In October 2004, Ms. Vickers was scheduled for a pubovaginal sling procedure at the WDC VAMC to treat stress incontinence. [Day 3 Tr., Doc. 198 at 140; Def. Ex. 68 at 1]. The pubovaginal sling procedure has a 90% improvement or cure rate for stress incontinence. [Day 3 Tr., Doc. 198 at

---

[13] As is explained *infra*, a later review of the images taken of Ms. Vickers's brain in 2002 and 2003 show the beginnings of the brain tumor. [Bailes De Bene Tr. at 23]. However, such images were not available to the doctors at the Charles George VAMC. Rather, only the reports of such images were, and those reports gave no indication of a mass such as a brain tumor possibly forming.

14

126]. However, Ms. Vickers canceled that surgery after refusing a pre-op examination from a physician's assistant. [Def. Ex. 68 at 1].

In 2006, Ms. Vickers moved to Asheville, North Carolina, to be closer to her granddaughters, Ms. Russe's children. [Day 1 Tr., Doc. 196 at 140]. Ms. Vickers established care at the Charles George VAMC, and, on December 12, 2006, she had her first appointment with Dr. Sarala Rajkumar, who would become her primary care provider until 2008. [Id. at 140-41, 143; Pl. Ex. 220 at 1].

On March 26, 2007, Ms. Vickers reported to Dr. Rajkumar that she was "very stressed out" because of ongoing fights with her daughter, Ms. Russe. [Pl. Ex. 98 at 2]. She also reported being angry at Ms. Russe's therapist. [Id.]. The next day, Ms. Vickers reported that she had exhibited verbally abusive behaviors, such as threatening, screaming at, or cursing at others in the previous seven days. [Pl. Ex. 94 at 2; Pl. Ex. 97 at 4].

In May 2007, Ms. Vickers reported to the Charles George VAMC that she was using four pads a day to manage her urinary incontinence. [Pl. Ex. 103 at 5]. In December 2007, Ms. Vickers had "concerning" blood glucose levels but was not yet prescribed insulin. [Pl. Ex. 95 at 2; Day 2 Tr., Doc. 197 at 271]. The record from her December 2007 blood glucose appointment notes that she was "often forgetful." [Pl. Ex. 95 at 3].

15

In January 2008, Ms. Vickers reported that she was using four underwear liners and four large pads a day to manage her urinary incontinence. [Pl. Ex. 221 at 8-9]. Ms. Vickers was also prescribed a medication to treat a UTI at that time.  [Id.; Bondar De Bene Tr. at 59].

In July 2008, Ms. Vickers underwent a urodynamic study.[14]  [Pl. Ex. 184 at 1].  The summary of the results of that assessment in Ms. Vickers's medical records reads: "genuine stress incontinence" and "overactive bladder (detrusor instability)." [Id. at 2]. A month later, a Charles George VAMC nutritionist, Nancy Kukla, noted in Ms. Vickers's records that Ms. Vickers seemed unable "to retain any kind of technical nutritional information."  [Pl. Ex. 92 at 2].

In January 2009, Ms. Vickers reported that during the past six weeks she had not taken the medication she had been prescribed for urinary incontinence.  [Pl. Ex. 228 at 6].  In September 2009, Ms. Vickers expressed an interest in having surgery to treat her urinary incontinence, but no such surgery ever occurred.  [Pl. Ex. 189 at 6; Yun De Bene Tr. at 22].  A month later, Ms. Vickers reported worsening incontinence, using between four and

---

[14] Dr. Linda Masters, who briefly served as Ms. Vickers's primary care provider after Dr. Rajkumar left the Charles George VAMC, referred Ms. Vickers for the study. [Pl. Ex. 184 at 3].

eight pads daily to manage her symptoms. [Pl. Ex. 189 at 1]. The Charles George VAMC urologist to whom she reported her symptoms assessed her incontinence as "predominantly urge"[15] and noted that "[o]besity and limited mobility certainly are exacerbating factors. Weight loss would probably help her to some extent." [Id. at 4]. Later in 2009, Ms. Vickers moved to Virginia and stopped receiving her primary care at the Charles George VAMC. [Day 1 Tr., Doc. 196 at 143].

Ms. Vickers moved back to the Asheville area in 2012. [Id. at 147-48]. Ms. Vickers subsequently visited the Charles George VAMC to reestablish care. [Pl. Ex. 223 at 1]. At that time, Dr. Lara Hume became Ms. Vickers's primary care provider. [Day 1 Tr., Doc. 196 at 149; Pl. Ex. 180].

In July 2013, Ms. Vickers presented to Dr. Hume complaining of an unexplained fifteen-pound weight loss over the past two to three weeks. [Pl Ex. 224 at 4]. At this appointment she also reported using five incontinence liners a day, four pads, and three under pads to manage her incontinence symptoms. [Id. at 7]. The section of the record from that appointment

---

[15] "Urge incontinence is a type of urinary incontinence in adults that involves sudden compelling urges to void and results in involuntary leakage of urine. . . . Patients with urge incontinence typically complain of a sudden compelling urge to void that is difficult to hold and that often results in involuntary leakage of urine." https://www.ncbi.nlm.nih.gov/books/NBK563172/ (last accessed June 3, 2024).

17

summarizing past medical history also states a "possible [history of] stroke" with "no residual deficit." [Id. at 6]. In September 2013, Dr. Hume requested that the VA provide Ms. Vickers with a four-wheel scooter to assist her in getting around because she was experiencing muscle weakness. [Pl. Ex. 151 at 1-2].

In January 2014, Ms. Vickers saw Dr. Alan Friedman,[16] a urologist at the Charles George VAMC, regarding her ongoing urinary incontinence. [Pl. Ex. 202 at 1; Yun De Bene Tr. at 26]. At this point, Ms. Vickers was reporting that she was "soak[ing] pads all day and all night." [Pl. Ex. 202 at 1]. Dr. Friedman performed a cystoscopy and concluded that Ms. Vickers's incontinence was an urge-type incontinence. [Pl. Ex. 202 at 3; Yun De Bene Tr. at 26]. Dr. Friedman continued Ms. Vickers on Vesicare, a urinary incontinence medication that she had been prescribed since 2012. [Yun De Bene Tr. at 26-27].

In May 2014, Ms. Vickers again visited Dr. Friedman for an evaluation of her urinary tract infections. [Pl. Ex. 186 at 1]. While Ms. Vickers had frequent bacterial overgrowth, she reported that she was not experiencing

---

[16] Dr. Alan Friedman has no relation to Dr. Henry S. Friedman, the Plaintiff's neuro-oncology expert.

symptoms of infection. [Id.]. Dr. Friedman concluded that, because Ms. Vickers was asymptomatic, it was not necessary to treat the bacterial colonization at that time. [Id. at 5]. Dr. Friedman then discharged Ms. Vickers from his care. [Id.]. Between 2014 and 2017, Ms. Vickers did not see another urologist. [Yun De Bene Tr. at 30].

Prior to being discharged by Dr. Friedman, in February 2014, Ms. Vickers had an appointment with Dr. Hume because she was experiencing increased lethargy. [Pl. Ex. 154 at 1]. In June 2014, Ms. Vickers expressed her "sorrows and frustrations with recent home and family events" to a Charles George VAMC provider and noted that Dr. Hume had suggested in February that she speak to a mental health provider. [Pl. Ex. 148 at 13]. While she was not ready to speak to a mental health provider in February, by June she expressed a readiness to proceed with a mental health consult. [Id.].

On July 1, 2014, Ms. Vickers underwent a mental health consult with Dr. Angela Steep Capozzi, a clinical psychologist at the Charles George VAMC.[17] [Id. at 8; Day 2 Tr., Doc. 197 at 49]. Dr. Capozzi listened to Ms.

---

[17] Dr. Capozzi is sometimes referred to in the medical record as "Dr. Steep"; for consistency, the Court will refer to her simply as Dr. Capozzi.

Vickers recount various stressors in her life, including her house burning down, her son's incarceration and subsequent institutionalization, and the death of one of her daughters. [Pl Ex. 148 at 8]. During that consult, Dr. Capozzi did not perform a "brief cognitive screener," a screener that she would only have performed had she felt that the patient had a possible cognitive impairment based on her interactions with the patient or the patient's medical record.[18] [Day 2 Tr., Doc. 197 at 97]. Because Ms. Vickers was ambivalent about what mental health services, if any, she desired at that time, Dr. Capozzi provided education on suicide warning signs and the crisis hotline and gave Ms. Vickers her contact information. [Pl Ex. 148 at 12].

On July 11, 2014, Ms. Vickers reported to a Charles George VAMC provider that she had experienced lethargy and dizziness the previous day after being scratched by her cat and applying witch hazel to the scratched area. [Id. at 1]. However, by the time she presented to the Charles George VAMC, the lethargy and dizziness had subsided. [Id.].

---

[18] Dr. Capozzi was asked about whether she performed a brief cognitive screener while being questioned about Defendant's Exhibit 83. [Day 2 Tr., Doc. 197 at 95-97]. Defendant's Exhibit 83 is identical to pages 8-12 of Plaintiffs' Exhibit 148. The Bates numbers for Defendant's 83/Pages 8-12 of Plaintiffs' 148 are VA_00003287 through VA_00003291.

In August 2014, Dr. Hume referred Ms. Vickers for a mammogram because she had unintentionally lost thirty-five pounds in the past two years. [Pl. Ex. 115 at 1; Day 2 Tr., Doc. 197 at 198]. Dr. Hume also ordered CT scans of her chest, abdomen, and pelvis. [Day 2 Tr., Doc. 197 at 199]. While the results of the CT scans were "not normal,"[19] Dr. Hume found that they did not clearly explain a case for weight loss. [Id. at 199-200].

In January 2015, Ms. Vickers again saw Dr. Capozzi (via a telephone appointment) regarding various stressors in her life. [Id. at 5]. She reported that although she had not been sure whether she wanted to engage in mental health services at her consult the previous July, she was "now ready to engage to better understand her interpersonal relationships and lack of trust with family members." [Id. at 5-6]. Ms. Vickers agreed to a referral with the mental health clinic at the Charles George VAMC. [Id. at 6]. She was seen once at the mental health clinic on June 22, 2015, but declined further treatment after that. [Pl. Ex. 129 at 13; Day 2 Tr., Doc. 197 at 64].

On April 21, 2015, Ms. Vickers called the Charles George VAMC to request a neurological consultation, stating that she was "having issues

---

[19] Dr. Hume did not explain during her testimony what was "not normal" about the CT scan results. The record from the scan indicates the presence of gallstones and some degenerative change in the spine but is otherwise unremarkable. [Pl. Ex. 150 at 2].

walking and standing up straight" and that she "[b]elieve[d] the mold in her house ha[d] gotten worse and [wa]s affecting her." [Def. Ex. 24 at 2]. On April 23, 2015, Ms. Vickers called again regarding mold and stiffness, stating that she had "googled mold and it said it could cause neuro problems and she would like to be tested to see if she has nerve damage." [Id. at 1]. Dr. Hume concluded that Ms. Vickers's issues with stiffness and walking were more likely to be related to her osteoarthritis than mold exposure and that testing for nerve damage from mold was not necessary based on her complaints. [Id. at 1-2; Day 2 Tr., Doc. 197 at 211-13].

In October 2015, Ms. Vickers reported to the Charles George VAMC that she was having difficulty with her short-term memory. [Pl. Ex. 227 at 4]. For example, when she wanted to look something up using a search engine she would have forgotten what she wanted to look up by the time she turned on the computer. [Id.]. It was unclear to Dr. Hume whether such concerns were an actual memory impairment or an impaired ability to concentrate due to attention deficit disorder. [Day 2 Tr., Doc. 197 at 246]. In December 2015, Ms. Vickers visited the Charles George VAMC for diabetes management and got lost on her way. [Pl. Ex. 118 at 2]. The note in her medical record from the December appointment reads: "She was confused about the location of this clinic." [Id.]. At this appointment, the Charles George VAMC provider

22

"[s]trongly recommended insulin initiation," but Ms. Vickers declined.  [Id. at 4].

In March 2016, the Charles George VAMC arranged for a VA vendor to install a stair lift at Ms. Vickers's home.  [Pl. Ex. 199 at 4].  The vendor was unable to install the lift as scheduled, however, because Ms. Vickers and Ms. Russe got into a verbal altercation after the vendors arrived to perform the installation.  [Id.].  The vendor reported to the Charles George VAMC that they "would not return to complete the job until the situation was safe." [Id.].

Kay Holtzinger, a licensed clinical social worker at the Charles George VAMC, called Ms. Vickers to follow up after the installation attempt.  [Id.]. Ms. Vickers explained that her daughter, Ms. Russe, had been having a "difficult time" and dealing with "emotional outburst[s]" after being in a car accident.  [Id. at 4-5].  Ms. Vickers informed Ms. Holtzinger that she would contact the Charles George VAMC the following week once Ms. Russe had returned to Durham where she was in law school at the time. [Id. at 5].  Ms. Vickers did call Ms. Holtzinger back as requested once Ms. Russe was no longer staying in the home. [Holtzinger De Bene Tr. at 133; Def. Ex. 77; Pl. Ex. 199 at 4-5]. Eventually, the stair glide was installed. [Day 1 Tr., Doc. 196, at 116].

23

In May 2016, Ms. Vickers had a diabetes education consultation with Ms. Kukla. [Pl. Ex. 129 at 5]. A note in Ms. Vickers's medical record summarizing that consult reads: "Vet does not seem able to take care of herself?" Ms. Holtzinger reviewed Ms. Vickers's chart after the consult and added a note to Ms. Vickers's medical record that reads: "[V]eteran appears to have decision making capacity and she does not have cognitive impairment listed on her problem list. . . . If cognitive impairment is leading to 'non-compliance,' please refer to mental health for cognitive screening." [Id. at 8]. Ms. Holtzinger's note was directed to Ms. Kukla, who was to evaluate whether a referral for a mental health consultation was appropriate. [Holtzinger De Bene Tr. at 57].

On June 21, 2016, Ms. Vickers had another appointment at the Charles George VAMC regarding the management of her diabetes. [Pl. Ex. 91 at 2]. Although she had apparently agreed to start administering insulin at her last diabetes-management appointment,[20] at the June appointment she reported that she "[d]id not start insulin as did not want to, changed her mind." [Id. at

---

[20] The appointment at which she agreed to start administering insulin appears to have occurred between her December 2015 appointment and the June 2016 appointment; however, the record of that appointment was not introduced into evidence and that appointment is therefore only memorialized in the June 2016 summary of the "plan from last visit."

24

1-2]. Ms. Russe attended the June diabetes-management appointment as well and expressed that she was "concerned" about Ms. Vickers initiating insulin because she was "afraid of [an] overdose" and felt that "dietary changes alone" could improve Ms. Vickers's condition. [Id. at 2]. The summary of the "plan" from that visit reads: "If A1C remaining above goal at next visit then willing to start basal insulin." [Id. at 4]. On the same day, Ms. Vickers had another diabetes education consultation with Ms. Kukla. [Pl. Ex. 129 at 8]. Ms. Russe attended that appointment with Ms. Vickers and "expressed concerns for her mother's cognition and self-care." [Id. at 9]. Ms. Kukla informed Ms. Russe that she would need to speak with Ms. Vickers's primary care provider, Dr. Hume, regarding her concerns. [Day 1 Tr., Doc. 196 at 117-18]. Ms. Kukla's reference to Dr. Hume was the "first time [Ms. Russe] had ever heard the name Dr. Hume before" because her mother "didn't share the names of her providers at that time in our relationship."[21] [Id. at 118].

After learning from Ms. Kukla that Dr. Hume was the provider to whom Ms. Russe should address concerns regarding her mother's mental health,

---

[21] This indicates how limited the communication was between Ms. Vickers and Ms. Russe, as Dr. Hume had been Ms. Vickers's primary care physician for four years at that point.

Ms. Russe and Ms. Vickers went to the Charles George VAMC women's health clinic and Ms. Russe requested to speak with Dr. Hume.[22] [Id.; Pl. Ex. 90 at 1-2]. Dr. Hume was unavailable, so Ms. Russe left a phone number at which she could be reached. [Day 1 Tr., Doc. 196 at 120-21]. Ms. Vickers informed a nurse in the clinic, Connie Leake, that she would like Dr. Hume to be able to speak with Ms. Russe, and Ms. Leake informed the two that she did not have the authority to add Ms. Russe as a healthcare contact in Ms. Vickers's administrative record. [Id. at 121; Pl. Ex. 90 at 2]. Ms. Leake informed Ms. Russe that Ms. Holtzinger could update Ms. Vickers's healthcare contact information and gave Ms. Russe the contact information for Ms. Holtzinger. [Day 1 Tr., Doc. 196 at 121]. Ms. Russe also informed Ms. Leake that Ms. Vickers would sometimes "tell [mental health] staff she is 'ok' when she is in fact she is [sic] feeling a bit overwhelmed or down and depressed." [Pl. Ex. 90 at 2].

On September 7, 2016, Ms. Vickers had another appointment with Ms. Kukla regarding diabetes education. [Pl. Ex. 129 at 13]. Ms. Kukla

---

[22] The medical record memorializing Ms. Russe's actions following the June diabetes consultation indicates that this visit to the women's health clinic took place on June 22, 2016. [Pl. Ex. 90 at 1]. However, in her testimony, Ms. Russe indicated that she immediately went to the clinic following the consultation, indicating that it took place on June 21, 2016. [Day 1 Tr., Doc. 196 at 118].

concluded at that meeting that Ms. Vickers was "habitually non-compliant" in the management of her diabetes. [Id.]. Ms. Kukla also made a note in Ms. Vickers's medical record regarding whether a cognitive impairment was leading to the noncompliance, stating: "On 5/10/16 note, [licensed clinical social worker] felt vet does not have cognitive impairment. However, vet appears to have some kind of mental health issues impeding her progress with her blood glucose management." [Id.]. In an addendum to that note, Ms. Holtzinger alerted Dr. Capozzi to Ms. Vickers's mental health issues. [Id.]. Dr. Capozzi responded to that alert, stating that Ms. Vickers had been seen once in the mental health clinic and declined further treatment and that Ms. Vickers's "readiness/desire to engage" in mental health treatment had been an "issue in the past." [Id.].

Also on September 7, 2016, after her appointment with Ms. Kukla, Ms. Vickers had another appointment regarding diabetes management. [Pl Ex. 179 at 1]. At that appointment, Ms. Vickers said she was "agreeable to start basal insulin today" but the provider noted that she "has agreed before." [Id. at 4]. Ms. Vickers was also provided with an "insulin teaching" because she "d[id] not recall previous teaching." [Id.].

On November 29, 2016, Ms. Russe called the Charles George VAMC with concerns that her mother could not "handle living independently

anymore." [Day 1 Tr., Doc. 196 at 181]. Ms. Holtzinger then called Ms. Vickers regarding Ms. Russe's concerns. [Pl. Ex. 233 at 2]. Ms. Holtzinger testified that she contacted Ms. Vickers directly "[d]ue to [a] history of strained relationship" with Ms. Russe. [Id.]. Ms. Vickers told Ms. Holtzinger that her "daughter thinks I'm going to keel over and die" but that she was still living independently and did not want to pursue a placement in a nursing home at that time. [Id.].

On March 2, 2017, Dr. Hume performed an annual examination of Ms. Vickers and increased her insulin dosage. [Pl. Ex. 226 at 1]. At that appointment, Ms. Vickers again expressed that she was not ready to stop living independently. [Id. at 2]. Dr. Hume noted that Ms. Vickers's "unkempt state," "uriniferous scent," and "stained, holey state of clothing" were concerning and suggested a social work or mental health consultation to consider alternative living options. [Id.]. Ms. Vickers was willing to "consider" such services but did not want to proceed with assistance at the time of the appointment. [Id.]. Four days later, Ms. Vickers called the Charles George VAMC and reported that she was "out of it" since taking her new dosage of insulin. [Pl. Ex. 179 at 5]. She also reported that she was not checking her blood glucose and had been on a "sugar spree," which likely explained her mental state. [Id.].

28

On May 17, 2017, Ms. Russe spoke with a Charles George VAMC provider and expressed concern about Ms. Vickers's mental health. [Id.]. Ms. Russe informed the provider that her mother was depressed and would be willing to take an antidepressant. [Id.]. Ms. Russe wanted these concerns addressed at her mother's upcoming appointment. [Id.]. On May 19, 2017, Ms. Vickers had an appointment with the Charles George VAMC, where she expressed her feelings of depression and noted that she was having trouble speaking. [Pl. Ex. 113 at 1-3]. Dr. Capozzi then performed a mental health screener on Ms. Vickers and suggested that she request an appointment with someone in the mental health clinic who could evaluate her for an antidepressant prescription. [Pl. Ex. 133 at 2, 4].

On July 3, 2017, Ms. Vickers had a call with Dr. Hume during which Ms. Vickers was "confused regarding several issues" and "thought [Dr. Hume] was Dr. Song[23] for much of the conversation until [Dr. Hume] expressed concern regarding her memory at which point [Ms. Vickers] attribute[d] this to having a lot going on." [Def. Ex. 19 at 2]. Based on Ms. Vickers's confusion, Dr. Hume noted that she suspected a mild cognitive impairment. [Id.]. Dr. Hume's notes from that call also include her plan to

---

[23] It is unclear who Ms. Vickers thought Dr. Song was, as no such provider appears in the medical records in this case.

contact Ms. Russe to discuss Ms. Russe having "more involvement [with] her Mother's healthcare." [Id.]. On July 11, 2017, Dr. Hume followed up with Ms. Vickers, asking if she would be willing to have an MRI scan performed based on Dr. Hume's concerns about Ms. Vickers's cognition. [Def. Ex. 18 at 1]. In that follow up, Dr. Hume also noted that she had been expecting a call from Ms. Russe on July 5 but had not heard from her. [Id.]. Ms. Vickers agreed to have an MRI, and on July 16, 2017, the MRI was ordered. [Day 2 Tr., Doc. 197 at 221]. However, that MRI did not take place as scheduled because, on July 21, Ms. Vickers presented to the VA emergency room after experiencing severe illness and vomiting. [Id.; Pl. Ex. 29 at 5]. The VA emergency room identified a "brain abnormality of significance," and, on July 22, 2017, Ms. Vickers was transferred from the Charles George VAMC to Mission Hospital in Asheville for further evaluation. [Day 2 Tr., Doc. 197 at 169; Def. Ex. 10 at 1].

On July 27, 2017, providers at Mission Hospital biopsied the "abnormality" in Ms. Vickers's brain. [Def. Ex. 10 at 1]. That biopsy revealed that the abnormality was a large, unresectable, left frontal low-grade glioma. [Id. at 1, 6]. On July 30, 2017, Ms. Vickers had a consultation with Dr. Praveen Vashist in the oncology department at Mission Hospital. [Id. at 1]. Dr. Vashist reviewed treatment options with Ms. Vickers and Ms. Russe and

noted that surgery was ruled out but that Ms. Vickers would be a candidate for radiation therapy. [Id. at 6]. Dr. Vashist encouraged Ms. Vickers to move in with Ms. Russe in Durham and establish care with Duke University Medical Center's neuro-oncology clinic. [Id. at 6-7].

Ms. Vickers was discharged from Mission Hospital and moved into Rose Manor, a community nursing home in Durham, North Carolina. [Day 1 Tr., Doc. 196 at 217]. On August 2, 2017, Ms. Vickers executed a durable general power of attorney, a healthcare power of attorney, and an authorization for use and disclosure of protected health information. [Pl. Ex. 251 at 1-20]. Ms. Russe was designated as Ms. Vickers's general agent and given the power to make decisions regarding Ms. Vickers's health care "when and if" her attending physician "determines that [she] lack[s] capacity to make or communicate decisions relating to [her] health care." [Id. at 12-13]. Ms. Russe was also designated as a person to whom Ms. Vickers's protected health information could be disclosed "when and if any licensed physician has determined that [Ms. Vickers] lack[s] capacity to make or communicate decisions relating to [her] health care." [Id. at 19]. On August 14, 2017, the Charles George VAMC approved a neuro-oncologist consultation at Duke to evaluate and treat Ms. Vickers's glioma. [Pl. Ex. 30 at 2]. A comment on the record of that approval indicates Ms. Vickers was

eligible for care at Duke because there was a "lack of required specialist care at this facility." [Id.].

On August 23, 2017, Ms. Vickers had her initial consultation with Duke. [Def. Ex. 29 at 10]. Upon review of the biopsy performed at Mission Hospital, the Duke medical team diagnosed Ms. Vickers with a grade II oligodendroglioma. [Id. at 13, 17]. The notes of the "plan" from that consultation read in part: "We discussed the role of the Duke team in relation to the local primary team; we will serve as a consulting service in care and will work collaboratively with local physicians. All chemotherapy will be managed by the local team. They are in agreement with this arrangement and verbalized understanding."[24] [Id. at 19]. An addendum to the consultation notes reads: "MRI repeated on 8/29/17 shows stable disease compared to 7/27/17 with no new enhancement. Given stable disease and pathology returning as oligodendroglioma (WHO gr II), we recommend daily temodar 50mg/m2 PO which will be ordered to Duke CC pharmacy. She will have CBC/CMP every two weeks and will return at 1 month for treatment evaluation and 2 months for MRI evaluation." [Id.].

---

[24] As addressed previously, the Court finds that this entry was necessary for Ms. Vickers's coverage through the VA to apply to her treatment at Duke. The medical records are clear that all treatment decisions were made by Dr. Dina Randazzo at Duke.

32

Dr. Dina Randazzo was the attending at this consultation and became Ms. Vickers's neuro-oncologist, overseeing her treatment at Duke. [Id. at 19; Friedman De Bene Tr. at 126-27]. At the time of the Duke consultation Ms. Vickers was still living at Rose Manor; however, she subsequently left Rose Manor and moved in with Ms. Russe in Durham. [Id. at 13; Day 1 Tr., Doc. 196 at 217]. Ms. Russe became her mother's primary caregiver at that time.[25] [Day 1 Tr., Doc. 196 at 89].

On August 28, 2017, Ms. Russe sent Dr. Hume a message via her mother's secure messaging portal for the Charles George VAMC expressing her frustration that, in her opinion, her concerns that her mother's declining cognitive function had been ignored. [Day 1 Tr., Doc. 196 at 183-84; Def. Ex. 41 at 145]. Specifically, Ms. Russe wrote as follows:

> Even though consistently the conversation was about her mental health function, the fact that [the licensed clinical social worker] did not think cognitive function was impaired was apparently why no one thought to check her for a brain problem. However, cognitive function HAD to have been diminishing as evidenced by her urine-soaked lifestyle. The Duke

---

[25] Ms. Russe testified at length about the emotional distress she endured upon becoming her mother's primary caregiver. For example, Ms. Russe described experiencing heart palpitations, shortness of breath, anxiety, and insomnia. [Day 1 Tr., Doc. 196 at 90]. However, as explained *infra*, the Court concludes that Ms. Russe's claims that her emotional distress is attributable to any actions of Dr. Hume or the Charles George VAMC are frivolous and without merit. Accordingly, the Court will not delve further into the evidence at trial related to the physical manifestations of distress that Ms. Russe experienced.

neuro-oncologist thinks this likely is a very slow growing tumor, 5-10 years' worth that is now huge and spreading from the one side to the other side of her frontal lobe. This tumor could explain her noncompliance issues, bedwetting/lifestyle issues. Odd that no medical professional considered this as a possibility. . . . The VA has failed. This situation is not supposed to happen.

[Def. Ex. 41 at 145-46].[26] Dr. Hume responded the next day expressing her sadness at Ms. Vickers's diagnosis. [Id. at 144].

On August 30, 2017, Ms. Russe sent Dr. Hume a message requesting help with getting VA approval for Ms. Vickers's chemotherapy. [Id.]. Specifically, Ms. Russe wrote as follows:

[C]an you assist with the following. The Duke specialty pharmacy that is providing my mom's chemo drug (Temodar?) is saying the VA will not cover their dispensing of it and that we will need to go thru the VA pharmacy (which we don't mind doing) and that will require a VA doctor (oncologist?) providing care for my mom. Your consult is so comprehensive, it would seem the latter requirement is unnecessary. Do you know if there is anything you can do to assist us in staying with Duke for her treatment, without needing to also see a VA oncologist (as it'd be repetitive) in order to get her drugs (which I don't mind picking up at the Durham VA).

---

[26] By this communication, the Court finds that the Plaintiffs were aware of the circumstances regarding Ms. Vickers's condition and treatment, and thus the claims that the Plaintiffs seek to assert in this action had accrued no later than this date.

34

[Id.].[27] Dr. Hume replied giving Ms. Russe a phone number to call to discuss coverage for care at a non-VA facility. [Id. at 143].

Also on August 30, 2017, Ms. Russe sent Dr. Hume another message informing her that Duke's diagnosis was a stage II oligodendroglioma that Duke believed had been developing for five to ten years. [Id. at 141]. Ms. Russe also informed Dr. Hume that Duke believed the tumor would be "operable with good results if it wasn't so large" but that Duke "sa[id] [Ms. Vickers] could live 5 [years] if it responds to chemo." [Id.]. However, no medical record was offered into evidence reflecting that any provider at Duke expressed such an opinion.

On September 4, 2017, Ms. Russe messaged Dr. Hume again regarding difficulties obtaining VA approval for Ms. Vickers's chemotherapy. [Id. at 139]. Ms. Russe explained that she had learned that "the VA system will not allow Duke to prescribe [Ms. Vickers] medicines" and that "the Durham VA will not allow her to have her Chemo prescriptions filled unless a Durham VA doctor is overseeing them." [Id.]. Ms. Russe went on to write

---

[27] By this communication, the Court finds that the Plaintiffs acknowledged that Ms. Vickers's treatment was being controlled and directed by the physicians at Duke, and not by Dr. Hume or anyone at the Charles George VAMC. This was even to the extent that it was Ms. Russe who made the contact facilitating the payment for the chemotherapy treatments through the VA, rather than anyone at Duke making that contact.

35

that "[a]pparently [Ms. Vickers] will need to be dual enrolled with [the Charles George VAMC] and Durham VA."  [Id.].  Ms. Russe stated that Ms. Vickers did not want to change primary care providers but that "[t]here is a chance we will have to have an [appointment] with a Durham [primary care provider] or oncologist (not sure which, or who)."  [Id.].  On the same day, Dr. Hume replied, agreeing that "dual enrollment will be best."  [Id. at 138].  Dr. Hume also explained that in order for her to continue ordering Ms. Vickers's medications she would need at least two weeks' notice and that, because she understood that much notice was not always possible "dual enrollment will be helpful[ ] so a provider there can order medications for window pick-up with less notice than waiting for them to arrive by mail."  [Id.].  Dr. Hume explained that, until dual enrollment was accomplished, Ms. Vickers may need to utilize the Durham VAMC emergency room to order medications. [Id.].  Once again, the Court finds that these communications demonstrate that Dr. Hume's position was no longer as a physician treating Ms. Vickers's condition, but had converted to an entirely administrative role to facilitate Duke's payment by the VA.

On September 13, 2017, Ms. Russe brought Ms. Vickers to the Durham VAMC to "set up a pipeline for the Durham VA to issue the chemotherapy."  [Day 1 Tr., Doc. 196 at 160-61].  Throughout the rest of

36

2017, Ms. Vickers received treatment for her brain tumor in Durham. [Id. at 164]. Dr. Randazzo prescribed Ms. Vickers Temodar, a chemotherapy medication. [Def. Ex. 41 at 141; Pl. Ex. 135 at 3-4; Day 2 Tr. Doc. 197 at 166]. Ms. Russe testified that, while Ms. Vickers was being treated at Duke, she was "in contact with [Dr. Hume] to coordinate all of [Ms. Vickers's] care and medicines being sent to the apartment when she lived with me." [Day 1 Tr., Doc. 196 at 158].

In either late 2017 or January 2018, Ms. Vickers had a lumpectomy and then a mastectomy at the Durham VAMC, having been diagnosed now with breast cancer.[28] [Day 1 Tr., Doc. 196 at 160]. In late 2017, Ms. Vickers moved out of Ms. Russe's residence and back into Rose Manor nursing home. [Id. at 217]. In January 2018, Ms. Vickers moved into Madison Health and Rehab, a nursing home in western North Carolina. [Id. at 164, 217].

On February 9, 2018, Ms. Russe sent a message to Dr. Hume requesting that Dr. Hume submit a referral to a neuro-oncologist recommended by Dr. Randazzo. [Pl. Ex. 135 at 5]. Ms. Russe wrote to Dr. Hume that: "[a]s you are still her [primary care provider] and she needs to

---

[28] It is unclear precisely when Ms. Vickers's breast cancer was discovered. The Durham VAMC diagnosed the breast cancer when Ms. Vickers was living in Durham, so presumably such cancer was diagnosed sometime in the fall of 2017. [See Day 2 Tr., Doc. 197 at 141].

37

get in to see a neuro-oncologist so her chemo treatment is not interrupted, please prepare the appropriate consult." [Id.]. Dr. Hume submitted the requested referral on February 10, 2018. [Id. at 6]. On February 12, 2018, Ms. Russe sent Dr. Hume a message informing her that Madison Health and Rehab was "running out of [Ms. Vickers's] meds for chemo." [Id. at 1-2]. Dr. Hume replied the same day, saying she would ask a nurse to contact Madison Health and Rehab as "it appears a 30 day supply was filled 1/26/18 such that she should not run out until 2/23/18 and I don't think the dose can be adjusted by the facility since it is a once daily capsule unless there's information I'm missing about this situation." [Id. at 2]. On February 14, 2018, Dr. Hume entered a note in Ms. Vickers's records requesting that Ms. Vickers have an appointment with her to "confirm clinical stability" such that the Charles George VAMC could dispense the chemotherapy pills prescribed by Dr. Randazzo. [Pl. Ex. 135 at 3-4]. At trial, Dr. Hume clarified that she did not prescribe the chemotherapy pills. [Day 2 Tr., Doc. 197 at 166]. On February 15, 2018, Ms. Vickers had the requested appointment

38

with Dr. Hume, her first appointment with Dr. Hume since her brain tumor was discovered.[29] [Day 1 Tr., Doc. 196 at 165; Pl. Ex. 227 at 2].

In the beginning of June 2018, Ms. Vickers started to exhibit "increasingly inappropriate sexual behaviors at Madison Health and Rehab." [Pl. Ex. 234 at 1]. Ms. Vickers had an appointment with a psychiatric consultant at Madison Health and Rehab who felt that Madison Health and Rehab may not be the safest place for her because of her behaviors. [Id.]. Someone from Madison Health and Rehab contacted the Charles George VAMC regarding Ms. Vickers's behaviors and expressed that Madison Health and Rehab "need[s] to send the veteran to the ER and will probably not be able to take her back." [Id. at 2]. On June 25, 2018, Ms. Vickers was admitted to the Charles George VAMC for a mental health evaluation. [Pl. Ex. 74 at 1]. At the time of that admission, Madison Health and Rehab informed the Charles George VAMC that Ms. Vickers was not welcome back at the facility. [Id.].

On June 26, 2018, the Charles George VAMC performed a CT scan of Ms. Vickers's brain and found that the oligodendroglioma had decreased in

---

[29] This again shows that Dr. Randazzo was the one directing care and that Dr. Hume's only role was to facilitate the provision of payment for the medicines that Dr. Randazzo had prescribed. This is further underscored by the fact that Dr. Hume and the Charles George VAMC had no role in treating Ms. Vickers' breast cancer.

39

size, indicating that the tumor was responsive to chemotherapy.  [Pl. Ex. 15 at 2-3].  On June 29, 2018, Ms. Vickers underwent a mental health consultation with the Charles George VAMC.  [Pl. Ex. 20 at 2].  As a result of that consultation, Ms. Vickers was prescribed Depakote, a mood stabilizer. [Id. at 7].  Ms. Vickers remained at the Charles George VAMC following that consultation while social workers attempted to secure another nursing home placement.  [Day 1 Tr., Doc. 196 at 219].

Throughout July 2018, Anthony Smalls, a Charles George VAMC social worker, contacted numerous nursing home facilities attempting to find a new placement for Ms. Vickers.  [Pl. Ex. 248 at 2].  Seven different facilities rejected Ms. Vickers because of the behaviors she exhibited while at Madison Health and Rehab.  [Id.].  On July 17, 2018, Ms. Russe contacted Mr. Smalls and asked what information about Ms. Vickers was being provided to the nursing home facilities at which he was trying to have Ms. Vickers placed.  [Pl. Ex. 242 at 1-2].  Mr. Smalls informed Ms. Russe that, because of HIPAA,[30] he could not share such information without Ms. Vickers's consent.  [Id. at 2].  Ms. Russe told Mr. Smalls that she had Ms.

---

[30] The Health Insurance Portability and Accountability Act ("HIPAA") "prohibits covered entities from 'knowingly' disclosing an individual's 'individually identifiable health information' without authorization."  Wilson v. UnitedHealthcare Ins. Co., 27 F.4th 228, 245 (4th Cir. 228) (citing 42 U.S.C. § 1320d-6(a), (b); 45 C.F.R. § 164.508(a)(1)).

Vickers's power of attorney, but Mr. Smalls informed Ms. Russe that, because Ms. Vickers had the capacity to make her own decisions, the power of attorney documents did not give Ms. Russe access to Ms. Vickers's medical records. [Id.]. On July 23, 2018, Mr. Smalls contacted Pruitt Health in Raleigh, North Carolina, to ask if it would accept Ms. Vickers. [Pl. Ex. 257 at 1]. Pruitt Health ultimately accepted Ms. Vickers's placement, and she lived there until her death three months later. [Day 1 Tr., Doc. 196 at 69-70, 219].

On October 16, 2018, Ms. Vickers died. [Def. Ex. 40 at 1]. The immediate cause of death listed on her death certificate is "cardiac arrest," and the underlying causes of death listed are "septic shock" and "likely urinary tract infection." [Id.]. She was 83 years old.

At some unspecified point during her care at the Charles George VAMC, Ms. Vickers received a VA-produced brochure entitled "Primary Care." [Day 1 Tr. at 99; Pl. Ex. 10B]. The brochure provides general information regarding the Charles George VAMC, including hours and location, a map of the campus, the various services available, guidelines making appointments, information regarding obtaining medication refills, and patient rights and responsibilities. [Pl. Ex. 10B]. One section of the brochure references the "Patient Aligned Care Team," describing it as follows:

A Patient Aligned Care Team (PACT) is each Veteran working together with health care professionals to plan for whole-person care and life-long health and wellness. They focus on:

- Partnerships with Veterans: A PACT is a partnership between you and your health care team to ensure you receive whole-person care.

- Access to care using different methods: Your PACT offers many ways to access health care.

- Coordinated care among team members: A PACT achieves coordinated care through partnership of your health care within your team and with the secondary team outside of your primary care system.

- Team-based care with Veterans as th[e] center of their PACT: Veterans are the center of the PACT. **Your family members and caregivers are part of your PACT**. The team also includes your primary care provider, a nurse who serve as your care manager, a clinical associate, and an administrative clerk.

[Id. at 8] (emphasis added). Ms. Russe testified that she believed that by creating PACTs, the VA was "intentionally encouraging veterans to appoint family members or friends to serve as members of their PACT team." [Day 1 Tr. at 102].

Ms. Russe alleges that the Charles George VAMC "refused to grant [her mother's] wish" to make Ms. Russe a part of the PACT. [Day 1 Tr. at

42

106-07]. Ms. Russe asserts that VA personnel "intentionally exclud[ed]" her from the team, despite Ms. Russe's repeatedly expressed concerns regarding Ms. Vickers's declining cognition. [Id. at 107-08]. Ms. Russe claims that her intentional exclusion from the PACT caused her severe emotional distress. [Id.].

### C. Disputed Medical Evidence

The Plaintiffs bring this medical malpractice and wrongful death action based on a theory of a failure to diagnose. In the Complaint, they break this down into subparts of a failure to evaluate Ms. Vickers and review her complete medical record, a failure to follow up on testing, and generally the failure to monitor, treat, and care for Ms. Vickers. [Doc. 1 at ¶ 98].

As previously noted, Dr. Hume was Ms. Vickers's primary care physician at the Charles George VAMC beginning in September 2012. The Plaintiffs assert that at some point between that date and Ms. Vickers's brain tumor diagnosis on August 23, 2017, Dr. Hume should have recognized Ms. Vickers's constellation of symptoms as being neurological in nature and thus should have referred her for a neurological consultation where the brain tumor would have been discovered when it was still operable. The Plaintiffs further assert that if Dr. Hume had more fully reviewed Ms. Vickers's medical

records from the prior period, this too in the application of the standard of care would have yielded such a consultation and diagnosis.

To support these contentions, the Plaintiffs presented three experts: Dr. Ellen Bondar, a specialist in the field of internal medical and primary care; Dr. Henry S. Friedman,[31] a specialist in the field of neuro-oncology; and Dr. Edward Yun, a specialist in the field of urology.[32]  The Defendant countered with experts Dr. John Spangler, a specialist in the field of primary care and family medicine; Dr. Julian Bailes, a specialist in the field of neurosurgery; and Dr. Paul Hatcher, a specialist in the field of urology.

---

[31] As noted *supra*, Dr. Henry Friedman has no relation to Dr. Alan Friedman, the Charles George VAMC urologist who treated Ms. Vickers in 2014.

[32] The Plaintiffs also presented the testimony of Dr. Hayden Huggins, who was tendered as an expert in the area of "biological research methodology."  Dr. Huggins holds a Ph.D. in molecular biology and works for a gene therapy enterprise.  He conceded that he does not work in "a medical field."  His testimony was, in substance, how to apply logic to the methods of the Government's life expectancy expert, even though Dr. Huggins has no education or experience in that field. The Court finds Dr. Huggins' testimony to be entirely unhelpful and even inadmissible, as he showed no expertise pertinent to his testimony. This is best illustrated by the fact that Dr. Huggins critiqued the life expectancy opinion, but admitted that he was unaware of the mortality tables of N.C. Gen. Stat. § 8-46 or how they apply in a court proceeding.

The Plaintiffs also tendered Maud Meulstee, a nurse practitioner, as an expert regarding the ordinary practices of the VA in caring for patient records and its system for referring patients to specialists.  The Court finds this testimony unhelpful and irrelevant to the issues in this case.

44

### 1. Evidence Regarding Dr. Hume's Compliance with the Standard of Care

Regarding the standard of care for a primary care physician (PCP) and whether Dr. Hume breached such standard, the Plaintiffs offered the testimony of Dr. Bondar. Dr. Bondar, however, last practiced as a primary care physician in 2011, and that was in New York and New Jersey. She had no knowledge regarding the standard of care applicable in Asheville, North Carolina, and had never even been to the state of North Carolina. She only testified that the applicable standard of care is a "national standard" without regard to "physician skill and training, facilities, equipment, funding and also the physical and financial environment of a particular medical community." Billings v. Rosenstein, 174 N.C. App. 191, 194, 619 S.E.2d 922, 924-25 (2005).[33] Such testimony fails to establish by the greater weight of the

---

[33] North Carolina also requires that a witness giving expert testimony on the appropriate standard of health care be a licensed health care provider in North Carolina or another state and must meet the following criteria:

> During the year immediately preceding the date of the occurrence that is the basis for the action, the expert witness must have devoted a majority of his or her professional time to either or both of the following:
>
> a. The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, the active clinical practice of the same specialty or a similar specialty which includes within its specialty the performance of the

45

evidence that Dr. Hume breached the standard of care for a primary care physician, or even what the applicable standard of care was. On this basis alone, Dr. Bondar's testimony is irrelevant and will be disregarded.

Even if Dr. Bondar were able to testify as to the appropriate standard of care, her testimony fails to show Dr. Hume breached any such duty. While Dr. Bondar testified that a primary care provider has a "duty to put things

_____

procedure that is the subject of the complaint and have prior experience treating similar patients; or

b. The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered, and if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty.

N.C. R. Evid. 702. Additionally "if the party against whom or on whose behalf the testimony is offered is a general practitioner, the expert witness, during the year immediately preceding the date of occurrence that is the basis for the action, must have devoted a majority of his or her professional time to either or both of the following: (1) Active clinical practice as a general practitioner; or (2) Instruction of students in an accredited health professional school or accredited residency or clinical research program in the general practice of medicine." Id.

The Government argues that Rule 702 of the North Carolina Rules of Evidence is substantive in nature and thus Dr. Bondar's testimony should be excluded in its entirety. See Harrington v. S. Health Partners, Inc., No. 1:21CV744, 2023 WL 3393569, at *4 (M.D.N.C. May 11, 2023); Carmely v. United States, No. 3:20-cv-00689-RJC-DCK, 2023 WL 2314873, at *1 (W.D.N.C. Mar. 1, 2023) (applying N.C. Gen. Stat. § 8C-1, Rule 414 as substantive law); see also Sigmon v. State Farm Mut. Auto. Ins. Co., No. 5:17-V-00225-KDB-DCK, 2019 WL 7940194, at *1 (W.D.N.C. Nov. 14, 2019) (same). The Court need not decide this issue, as the same reasons that would exclude Dr. Bondar's testimony in state court are the reasons that the Court here finds her opinions to be entirely unpersuasive.

together and to arrive at a correct diagnosis," she admitted that she could not pinpoint when a primary care provider should have referred Ms. Vickers for a neurological consultation due to the nonspecific and subtle nature of Ms. Vickers' symptoms, together with her several diagnosed maladies, including diabetes and obesity.  [Bondar De Bene Tr. at 164, 211-13, 214-15].

Indeed, the medical records demonstrate that the vast majority of the symptoms to which the Plaintiffs point as being indicative of a brain tumor[34] are more in the nature of one-off complaints of stress, lethargy, difficulty moving, and mild confusion.  And for virtually all of those complaints, as well as for Ms. Vickers's more persistent issues like urinary incontinence, such symptoms were better explained by one of her numerous known comorbidities.

---

[34] While the Court has endeavored to provide a comprehensive account of the symptoms to which the Plaintiffs point as signals of the brain tumor, there were numerous times during the trial that the Plaintiffs introduced a particular record, had the witness read from the record, and moved on without doing more to explain the relevance of what the witness read. Accordingly, it is possible that the Plaintiffs think a record not highlighted here is of utmost importance to their claim. However, because of the Plaintiffs' failure to present their case in a logical, organized manner, further exploration of this theory of breach would require the Court to engage in pure speculation about what intention the Plaintiffs had when they introduced each record into evidence. The Court declines to engage in such an exercise.

47

On the issue of the PCP standard of care, the Government offered the expert testimony of Dr. John Spangler, who is a primary care physician in Winston-Salem, North Carolina, and a professor of medicine at Wake Forest University School of Medicine in the Department of Family Medicine. Dr. Spangler testified that he is very familiar with the standard of care in North Carolina, and in the Asheville area particularly, because he trains students for service in the Asheville community, and because he is aware of the similarities in the practice of medicine between Asheville and Winston-Salem where he practices. Based on the relative familiarity with the relevant standards, the Court finds Dr. Spangler's testimony to be much more credible and useful than that of Dr. Bondar.

Dr. Spangler testified that Dr. Hume acted in accordance with the standard of care in her review of the prior medical records of Ms. Vickers. He opined that a primary care physician cannot be expected to review every prior medical record of a patient, particularly one with a mountain of records such as Ms. Vickers. There are certain records that should be reviewed in accordance with the standard, and Dr. Spangler testified that Dr. Hume reviewed those.

48

With particular regard to the review of the 2002 and 2003 brain scan reports[35] for Ms. Vickers, Dr. Spangler opined that a primary care physician would understand those to simply describe an aging brain; that the changes described there would be normal for anyone over the age of 65. [See Day 4 Tr., Doc. 199 at 29 ("this is an anatomic fact that first-year medical students learn")]. Further, these changes are particularly prevalent in patients with cardiovascular problems and diabetes, such as Ms. Vickers. Thus, even if the standard of care required Dr. Hume to review the reports from so many years prior, the review of those records would not have dictated any different course of treatment by Dr. Hume. For these reasons, the Court finds that Dr. Hume was not negligent in her review and interpretation of the medical records of Ms. Vickers.

The Plaintiffs assert that Ms. Vickers's history of urinary incontinence and urinary tract infections, taken along with her history of psychological and memory issues, should have led Dr. Hume as a primary care physician to refer Ms. Vickers for a neurological consultation to determine whether a brain

_____

[35] The only records available at the Charles George VAMC were the reports, not the scans themselves, because of the limitations on the VA's record-keeping systems. Since the scans were done at the WDC VAMC, the scans themselves could not be transmitted. Thus, while the reports of the brain scans may have been available to Dr. Hume in Ms. Vickers's medical records, apparently the images themselves were not.

49

tumor was the root cause of these maladies. Dr. Spangler opined, however, that these urinary issues were normal for a woman of Ms. Vickers's age, and that the psychological issues were matters of long standing and even the basis of Ms. Vickers's total service-related disability dating back decades. Therefore, the Court finds that Dr. Hume did not breach the standard of care in failing to refer Ms. Vickers for a neurological consultation in view of this constellation of symptoms.

For these reasons, the Court finds and concludes that Dr. Hume was not negligent in her evaluation, monitoring, treatment, follow-up or general care of Ms. Vickers, or in her review of Ms. Vickers's medical records.

### 2. Evidence Regarding Dr. Rajkumar's Compliance with the Standard of Care

The Plaintiffs also claim that Dr. Rajkumar was similarly negligent in her treatment of Katherine Vickers in that she failed to adequately review the medical records and failed to recognize Ms. Vickers's symptoms as needing a neurological consultation to determine whether she was suffering from a brain tumor. [36]

---

[36] The Plaintiffs specifically assert that Dr. Rajkumar was negligent in failing to obtain and view the brain scan images from 2002 and 2023. However, those images were not contained within the Charles George VAMC medical records and were not accessible electronically. In any event, the confidential physician-patient relationship between Dr.

The first problem with this claim is the statute of limitations. The continuous treatment doctrine tolls the statute of limitations only to the extent that treatment continues by the provider in question or by those under her direction. Dr. Rajkumar last treated Ms. Vickers or directed her treatment in 2009. As such, the statute of limitations expired on this claim long before the Plaintiffs filed this action.

As to the substantive merits of the claims regarding the treatment by Dr. Rajkumar, the Plaintiffs' evidence suffers from the same shortcomings as the claim against Dr. Hume. The brain scan reports did not put Dr. Rajkumar as a primary care physician on notice of any neurological issue out of the ordinary for a person of Ms. Vickers's age. After all, the report of the 2002 scan specifically states that "There is no evidence of an intracranial mass." [Pl. Ex. 11 at 18]. Moreover, Ms. Vickers's other symptoms were generally explained by her other diagnoses. As such, the Plaintiffs have failed to prove by the preponderance of the evidence that Dr. Rajkumar was in any way

---

Rajkumar and Ms. Vickers ended in 2009 when Ms. Vickers moved to Virginia. It is undisputed that Dr. Rajkumar did not direct any treatment of Ms. Vickers after that date. As such, the continuous treatment doctrine has no application, and the Plaintiffs' claim regarding Dr. Rajkumar is clearly barred by the statute of limitations.

51

negligent in her evaluation, monitoring, treatment, follow-up or general care of Ms. Vickers, or in her review of the medical records.

### 3.    Causation Evidence

The Plaintiffs also presented the expert testimony of urologist Dr. Edward Yun.  Dr. Yun made clear, however, that he offered no opinion as to whether any primary care physician breached any standard of care in any respect of the treatment of Ms. Vickers.  In addition, he testified that he was "not critical of any VA urologist."[37]

Dr. Yun did testify that Ms. Vickers had urinary incontinence issues going back to the 1990's, but that her stress incontinence progressed to urge incontinence.   Based thereon, he opined that the cause of her urge incontinence was a frontal lobe brain tumor.  However, he also testified that a brain tumor was the cause or urinary incontinence only in a minority of cases.  Moreover, he stated that uncontrolled diabetes was a more common

---

[37] To the extent that the Plaintiffs assert any negligence on the part of Dr. Alan Friedman, such claims clearly would be barred by the statute of limitations.  This is particularly significant because the Plaintiffs' main theory appears to be that Ms. Vickers's incontinence issues should have alerted *someone* at the Charles George VAMC to the connection between these symptoms and a brain tumor.   However, the one urologist who examined her at the Charles George VAMC made no such connection, and any claim regarding his failure to do so long expired.

cause.  Ms. Vickers had an A1C of 12.3 in April 2016, and 13.4[38] in June 2016 (compared to a 6.5 threshold for diabetes).  In addition, he testified that obesity is a contributing cause to urge incontinence.  It is undisputed that Ms. Vickers was obese. With all of these factors, Dr. Yun did not explain how he arrived upon his opinion that a brain tumor was the cause of Ms. Vickers's urge incontinence.  Thus, the Court discounts this opinion.

The Government called as an expert urologist Dr. Paul Hatcher.  He opined that Dr. Vickers's urge incontinence was caused by a combination of several factors, namely: (1) obesity; (2) diabetes resulting in nerve damage, thus lessening urinary control; (3) the fact that Ms. Vickers had borne four children, had a hysterectomy and likely suffered from resultant vaginal atrophy; and (4) that Ms. Vickers had such ambulatory difficulty that she had trouble getting to the toilet in time.  He further opined that it was extremely unlikely that Ms. Vickers's urge incontinence was caused by a brain tumor. The Court finds Dr. Hatcher's explanation much more credible in light of how the causes he relies upon match so much more closely to Ms. Vickers's

---

[38] Having A1C levels of this magnitude placed Ms. Vickers at a greater risk for a number of long-term or chronic conditions, such as heart disease, kidney disease, nerve damage, stroke, memory issues, and retinopathy.  See The Diabetes Control and Complications Trial/Epidemiology of Diabetes Interventions and Complications Study at 30 Years: Overview | Diabetes Care | American Diabetes Association (diabetesjournals.org), available at https://diabetesjournals.org/care/article/37/1/9/31789/The-Diabetes-Control-and-Complications-Trial (last accessed June 3, 2024).

53

medical conditions, and because Dr. Yun did not clearly explain why he found such an unlikely cause to be the actual cause of Ms. Vickers's urinary condition.

Since none of the urological evidence pertained to any allegation of medical negligence, it may seem that this was all an irrelevant detour.  Dr. Yun, however, provided another opinion regarding causation.  He opined that the urge incontinence caused Ms. Vickers to suffer repeated urinary tract infections, which were then repeatedly treated with antibiotics, resulting in Ms. Vickers becoming antibiotic resistant.  As a result, Dr. Yun opined, when Ms. Vickers contracted a urinary tract infection in her final nursing home placement, the antibiotic treatment was insufficient to prevent it developing into sepsis, which resulted in her death.

First, it should be noted that even if this chain of causes were proven, it is so attenuated as to not constitute proximate cause.  See Olds v. United States, 473 F. App'x 183, 185 (4th Cir. 2012) ("Proximate cause is . . . a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the

facts as they existed.); <u>Sheridan v. United States</u>, 773 F.Supp. 786, 791 (D. Md. 1991) (finding that connection between plaintiff's injuries and failure of assailant's roommate to report possession of weapons by assailant was a "chain [that] has a number of kinks and is contorted to such an extent that it cannot fulfill the proximate cause standard"). Moreover, when taken with the lack of support for the first step of Dr. Yun's progression, the Court is left to find and conclude that even if there were any negligence in the failure to treat Ms. Vickers's incontinence, such would be neither a cause nor a proximate cause of her death. It is also noted that this alternate theory was not pleaded and was first put forward at trial.

The Plaintiffs, however, attribute more than Ms. Vickers's death to the alleged negligence of a VA doctor. They called as an expert Dr. Henry S. Friedman, a neuro-oncologist. He did not offer an opinion that any VA doctor failed to comply with any standard of care. He was offered as an expert only in the field of neuro-oncology, and so could not offer any such opinion regarding a primary care physician or urologist.[39]

---

[39] Dr. Friedman testified "To me [as a neuro-oncologist], where everything I take care of is a brain tumor, a headache is a brain tumor until ruled otherwise." [Friedman De Bene Dep. at 136]. He did not, however, offer this as an opinion of the standard of care, even for a neuro-oncologist, much less a primary care physician. Obviously, a primary care physician cannot treat every headache as a brain tumor.

55

The purpose of Dr. Friedman's testimony appears to have been to present the point that had Ms. Vickers's tumor been diagnosed earlier, during a time when it might have been resectable, she would not have suffered various symptoms during the balance of her life, such as headaches, lethargy, sleep disruption, dizziness, and weakness. Thus, his testimony appears to be directed to a diminution in the quality of Ms. Vickers's life in her last years due to the failure to resect the tumor some years earlier.

Noticeably absent from Dr. Friedman's opinion, however, was any evidence of when Ms. Vickers's tumor may have been treatable by resection. While Dr. Friedman testified that he thought the tumor would have been resectable if it had been diagnosed at some earlier time, he could not identify a particular time frame when the tumor would have been resectable and ultimately conceded that his opinion on this issue was "a matter of speculation." [Friedman De Bene Dep. at 155-56]. He further candidly testified that whether a tumor would be resectable would ultimately be a question for a neurosurgeon, which he is not. The Government, however, did call an expert neurosurgeon, Dr. Julian Bailes. He testified that Ms. Vickers's tumor was not resectable in 2017, but neither was it in 2003. He reviewed the scans from 2003 that were not available to the doctors at the

56

Charles George VAMC.[40]  He testified that the tumor at that time did not have discrete boundaries.  He testified that the type of tumor Ms. Vickers had concerns the myelin sheath surrounding the nerves that is diffuse in type and difficult to tell whether it is a tumor, or the result of a stroke or other injury.  He also testified, however, that it is a type of tumor that is responsive to chemotherapy, which Ms. Vickers's was.  Her tumor shrank with treatment.  Her reported peripheral symptoms, however, did not subside, leading Dr. Bailes to conclude that her incontinence and other symptoms were the result of other causes.   He further opined that Ms. Vickers' constellation of symptoms was not ordinarily found with such a tumor, further buttressing his opinion that these symptoms were the result of Ms. Vickers's myriad other maladies, and not her brain tumor.  For these reasons, Dr. Bailes opined that from 2006 to 2016, Ms. Vickers did not present with any symptoms of a neurological condition.

The Court finds Dr. Bailes's opinions persuasive, and thus finds and concludes that the diminution in the quality of Ms. Vickers's life in her waning

---

[40] As noted *supra, a*lthough these brain scans were performed at a VA medical facility, there was evidence presented at trial that VA medical facilities often had difficulties obtaining medical records from other VA facilities, particularly until 2013 when the VA upgraded its electronic medical records system.  Even with the upgrade, however, radiographic images, such as the brain scans performed in 2003, were not available through the electronic system.

years was the result of her many ailments and not the development of her brain tumor. The Court further finds and concludes there was no negligence on the part of any VA doctor that resulted in any such reduced quality of life. Moreover, even if there had been a breach of the standard of care in failing to identify or diagnose Ms. Vickers's brain tumor prior to August 23, 2017, such failure was not the cause of her death, as the tumor was never resectable during the period of Ms. Vickers's treatment at the Charles George VAMC. As such, the chemotherapy treatment she received upon her diagnosis was the most appropriate and effective treatment for her condition.

### D. Findings and Conclusions Regarding Medical Malpractice and Wrongful Death Claims

Based on all of the foregoing, the Court finds and concludes as follows:

(1) The Plaintiffs' action against the United States based on the alleged medical malpractice of persons at the Charles George VAMC is barred by the applicable statute of limitations.

(2) Dr. Lara Hume was not negligent in her evaluation, monitoring, treatment, follow-up or general care of Katherine Vickers, or in the review of Ms. Vickers's medical records. Further, Dr. Hume was not negligent in failing to diagnose or failing to timely

58

diagnose Ms. Vickers's brain tumor, or in failing to take any steps necessary to diagnose or timely diagnose the tumor.

(3)    Dr. Sarala Rajkumar was not negligent in her evaluation, monitoring, treatment, follow-up or general care of Katherine Vickers, or in the review of Ms. Vickers's medical records. Further, Dr. Rajkumar was not negligent in failing to diagnose or failing to timely diagnose Ms. Vickers's brain tumor, or in failing to take any steps necessary to diagnose or timely diagnose the tumor.

(4)    The Plaintiffs have not proven by the preponderance of the evidence that any health care professional or group of health care professionals at the Charles George VAMC were negligent in their evaluation, monitoring, treatment, follow-up or general care of Katherine Vickers, or in the review of Ms. Vickers's medical records. Further, the Plaintiffs have not proven by the preponderance of the evidence that any health care professional or group of health care professionals at the Charles George VAMC were negligent in failing to diagnose or failing to timely diagnose Ms. Vickers's brain tumor, or in failing to take any steps necessary to diagnose or timely diagnose the tumor.

(5)     No actions or failures to act of Dr. Lara Hume, Dr. Sarala Rajkumar or any other health care provider at the Charles George VAMC were the proximate cause of any injury to Katherine Vickers or of her death.

### E.     Emotional Distress Claims

In addition to the medical malpractice and wrongful death claims, the Plaintiffs assert claims for emotional distress, both intentional and negligent. The Plaintiffs bring these claims on behalf of Ms. Russe as Katherine Vickers's daughter, in addition to the claims for Ms. Vickers. The Plaintiffs pleaded all four of these claims in an abbreviated fashion without differentiating between them. Thus, the Plaintiffs' presentation of these claims in the evidence and the briefing, as well as the pleadings, has been haphazard and inconsistent.

### 1.     IIED Claims

The Court will first address the intentional infliction of emotional distress (IIED) claims. To recover for IIED under North Carolina law, a plaintiff must prove that the defendant engaged in "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause[,] (3) severe emotional distress to another." Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981). The North Carolina Court of Appeals has

60

instructed that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 493-94, 340 S.E.2d 116, 123 (1986) (quoting Restatement (Second) of Torts, § 46 comment (d) (1965)).

As a preliminary matter, the FTCA does not permit recovery for an intentional tort such as IIED. The only intentional torts that come within the FTCA are assault, battery, false imprisonment, false arrest, abuse of process, and malicious prosecution, if committed by a law enforcement officer. See 32 C.F.R. § 750.23(b). In short, there is no basis in law or fact for the Plaintiffs' IIED claims under the FTCA.

Even if such claims could be asserted, the Plaintiffs' claims for the intentional infliction of emotional distress are without merit. The only argument that the Plaintiffs make regarding the IIED claims pertains to the refusal of Charles George VAMC social worker Anthony Smalls to honor the Health Care Power of Attorney (HCPOA) of Ms. Russe, in light of HIPAA. [Doc. 201 at 27]. As support for this claim, the Plaintiffs cite in their closing brief to Plaintiffs' Exhibit 242. That exhibit, however, was never offered into evidence nor received. In fact, no witness was questioned about this exhibit.

In the voluminous record in this case, the Court cannot find where the Plaintiffs offered any evidence on this point or asked any witness about it. The Plaintiff certainly cite to nothing.[41]   As such, the Court finds no evidentiary support for this claim.

Notwithstanding the Plaintiffs' absence of evidence on this point, even if the Plaintiffs had offered such, this claim would fail.  There is no mention of any acts by Mr. Smalls in either the Plaintiffs' Complaint or the SF 95s.  As such, this claim was never properly before the Court.  Moreover, even if this claim had been pleaded and supported by evidence, the actions that the Plaintiffs assert were committed by Mr. Smalls were not "outrageous" within the meaning of the law.  For a licensed clinical social worker in a hospital to misunderstand—or even purposely misrepresent—the interplay between the HCPOA and HIPAA does not approach the threshold expressed in Dickens.

To further illustrate how unorthodox the Plaintiffs' claim and presentation was, in their closing brief they conflate the legal standards of outrageous conduct and gross negligence.  [Doc. 201 at 27].  Then they argue that the case of Burgess v. Busby, 142 N.C. App. 393, 544 S.E.2d 4

---

[41] The Plaintiffs examined the Government's records custodian, Kim Pierce, regarding the HCPOA document.  She testified, however, that she was unaware whether Ms. Vickers signed the document, and even if it had been signed, whether it would have been available to a licensed clinical social worker like Mr. Smalls.

(2001), supports the claim. In that case, a doctor sought to convince all of his health care provider colleagues in the community to provide no medical care to the persons who were members of a jury that found his practice liable for malpractice. Id. at 400, 544 S.E.2d at 7. The Court of Appeals held that this alleges an outrageous act. Id. at 401, 544 S.E.2d at 8. The Plaintiffs' assertions regarding Mr. Smalls are in no way similar.

In addition, the Plaintiffs argue that "Kay Holtzinger intentionally denied Ms. Vickers the support of her chosen PACT members when she refused to acknowledge Ms. Vickers['s] 2016 notice that she wanted Ms. Russe added as a healthcare agent," and "[t]his indicates malicious intent as it was intrusion into the private affairs of Ms. Vickers[ ] that was not within the purview of Ms. Holtzinger to circumvent Ms. Vickers['s] express wishes in the record." [Doc. 201 at 23]. At trial, Ms. Russe testified that in 2015, 2016, and 2017, there were at least two instances where Dr. Hume ignored requests from Ms. Vickers to involve Ms. Russe in her care. [Day 1 Tr., Doc. 196 at 213-14]. Further, Ms. Russe contacted providers at the Charles George VAMC on four occasions in 2016 and in May 2017 to express concerns about Ms. Vickers's mental cognition, [Pl. Ex. 129 at 9; Pl. Ex. 90 at 1-2; Def. Ex. 41; Pl. Ex. 179 at 5; Day 1 Tr., Doc. 196 at 181], and providers

63

at the Charles George VAMC did not respond to Ms. Russe about those concerns, [Day 1 Tr., Doc. 196 at 178-81].

During her own testimony at trial, Ms. Russe asserted that it was outrageous for the United States to violate the "promise" of the inclusion of family members as set out in the brochure. This "claim" was likewise never pleaded, and would now appear to be abandoned. In any event, the failure of the PACT to include Ms. Russe in the formulation of a care plan for Ms. Vickers fails to rise to the type of outrageous behavior required to prevail on a claim of IIED.[42]

Based on the foregoing, the Court finds and concludes that no one acting on behalf of the United States committed any outrageous act that would support an IIED claim. Therefore, this claim will be dismissed with regard to both Plaintiffs.

---

[42] Ms. Russe also attempts to couch her claim regarding her exclusion from the PACT in terms of a breach of contract. This theory, which is also unpled, also fails on its merits. There is absolutely no evidence that the PACT brochure that Ms. Russe received constitutes a contract between her and the Charles George VAMC. Therefore, to the extent that the PACT brochure "promised" her anything, it is a promise without a meaning. The PACT's apparent intention—to include a veteran's family members in the healthcare decision-making process—is at most an aspirational statement that has no operative legal effect. For the Plaintiffs to suggest otherwise is simply frivolous.

## 2. *NIED Claims*

The Plaintiffs' negligent infliction of emotional distress (NIED) claims fare no better. To recover for NIED, a plaintiff must prove that (1) the defendant engaged in negligent conduct, (2) reasonably foreseeable to cause the plaintiff severe emotional distress, (3) which, in fact, caused the plaintiff severe emotional distress. Sorrells v. M.Y.B. Hospitality Ventures, 334 N.C. 669, 672, 435 S.E.2d 320, 321-22 (1993).

The Plaintiffs alleged in their Complaint that those acting on behalf of the Government "ignored" (1) Ms. Vickers's medical records, (2) her requests for referral, (3) her complaints of ailments, and (4) Ms. Russe's reports of Ms. Vickers's "mental behaviors." [Doc. 1 at ¶ 127]. However, Ms. Vickers's medical records are voluminous. These records recount the VA health professionals treating Ms. Vickers regularly for a multitude of ailments over a number of years. The Court has already found that the VA providers acted within the standard of care (and thus were not negligent) in their treatment of Ms. Vickers. Each of these allegations concerns some aspect of that treatment. The Plaintiffs have not demonstrated by the preponderance of the evidence that anyone on behalf of the Government breached the standard of care with regard to these specific areas.

65

If the Plaintiffs had proven medical malpractice, some emotional distress/mental anguish damages may have flowed therefrom. The Court, however, has held that there was no medical malpractice. There is no separate NIED claim that flows from a patient's disappointment as to how her case was handled where there was no professional negligence.

In their post-trial closing brief, the Plaintiffs focus on the actions of social worker Kay Holtzinger. Once again, the Plaintiffs focus on the failure to abide by the "promise" set out in the PACT brochure. First of all, the Plaintiffs make no mention of Ms. Holtzinger or the PACT "promise" in either their Complaint or the SF 95s. As such, this claim is not before the Court.

Nonetheless, the claim also fails on the merits. HIPAA requires that a patient provide a valid written authorization before private medical information can be provided to other individuals. 42 U.S.C. § 1320d-6(a), (b); 45 C.F.R. § 164.508(a)(1)). A valid authorization must be signed by the patient and must include a description of the information to be used or disclosed, as well as identify the individuals authorized to receive such information. 45 C.F.R. § 164.508(c)(1). Consistent with HIPAA, Ms. Holtzinger testified that she "cannot reach out to family members without the veteran's written consent and permission." [Holtzinger De Bene Tr. at 84]. There is absolutely no evidence that Ms. Vickers gave a valid authorization

66

that meets HIPAA's requirements and allowed the Charles George VAMC to disclose information about her health care to Ms. Russe.

Further, providers at the Charles George VAMC, and particularly Ms. Holtzinger, understood Ms. Vickers to have a difficult relationship with Ms. Russe and to disagree with Ms. Russe's opinion regarding the state of her health. Considering the requirements of HIPAA[43] and the Charles George VAMC's knowledge of the contentious relationship between Ms. Vickers and Ms. Russe, the Court cannot find that employees at the Charles George VAMC were negligent in failing to include Ms. Russe in Ms. Vickers's PACT.[44]

---

[43] Even if the Court were convinced that North Carolina law imposed a duty to include Ms. Russe in Ms. Vickers's medical care, any such duty would be preempted by federal law, because such duty would be inconsistent with HIPAA. See Mutual Pharm. Co., Inc. v. Bartlett, 570 U.S. 472, 480 (2013) (holding that a state law is preempted where it is impossible for a private party to comply with both state and federal requirements).

[44] Although Ms. Vickers executed a health care power of attorney and an authorization for the use and disclosure of protected health information in August 2017, those documents granted Ms. Russe the power to make decisions regarding Ms. Vickers's health care and access Ms. Vickers's health information only if a physician "determine[d] that [Ms. Vickers] lack[ed] capacity to make or communicate decisions relating to [her] health care." [Pl. Ex. 251 at 13, 19]. On February 9, 2018, Dr. Hume entered a note in Ms. Vickers's medical record that "[d]aughter Rupa Russe is her POA/medical decision maker since patient has cognitive impairment." [Holtzinger De Bene Tr., at 97]. However, Ms. Holtzinger testified that just "because Dr. Hume wrote that does not mean that it is accurate at this point in time." [Id. at 99]. Rather, "[t]here would need to be *other paperwork involved stating that she does lack capacity to make decisions*." [Id. at 91] (emphasis added). Ms. Holtzinger further testified that Ms. Vickers's paperwork did not "confirm" the information noted by Dr. Hume, and she "[has] not *seen anything that has deemed [Ms. Vickers] to lack capacity*." [Id. at 97] (emphasis added). Thus, in addition to

67

Therefore, because the Plaintiffs have failed to prove by a preponderance of the evidence that employees at the Charles George VAMC engaged in negligent conduct when excluding Ms. Russe from Ms. Vickers's PACT, the Plaintiffs' NIED claims must fail.

It is understandable that Ms. Russe was distressed. Her mother was very ill and had been for years. To attribute such distress to social workers who were trying to navigate the complexities of HIPAA, however, is entirely implausible. It is so implausible in fact, that the Plaintiffs did not assert such actions as being a source of Ms. Russe's distress until the trial was approaching. Moreover, although one would imagine that Ms. Vickers was distressed by her poor health, Ms. Vickers repeatedly expressed her full satisfaction with her treatment at the Charles George VAMC. All of these factors, taken with the sheer paucity of evidence linking any action or inaction of any VA employee with any emotional distress of Ms. Russe or Ms. Vickers, underscores that the Plaintiffs' emotional distress claims are not supported by law or fact. Plaintiffs' counsels are cautioned not to pursue such groundless claims.

---

there being no evidence that Ms. Vickers gave a valid authorization to disclose her individually identifiable health information as required by HIPAA, the Plaintiffs have also failed to show that Ms. Vickers's health care power of attorney or authorization for the use and disclosure of protected health information was effective in July 2018.

68

## CONCLUSION

For the foregoing reasons, the Plaintiffs have failed to prove any of their remaining claims by a preponderance of the evidence. Accordingly, judgment will be entered in favor of the Defendant on all of the Plaintiffs' claims.

## ORDER

**IT IS, THEREFORE, ORDERED** that a Judgment shall be entered in favor of the Defendant United States against the Plaintiffs Rupa Russe and the Estate of Katherine Monica Vickers, and the Plaintiffs shall recover nothing of the Defendant. The costs of this action are hereby taxed against the Plaintiffs. A judgment consistent with this Memorandum of Decision and Order shall be filed contemporaneously herewith.

**IT IS SO ORDERED.**

Signed: June 11, 2024

Martin Reidinger
Chief United States District Judge

69